## CÆSAR et al. v. CAPELL et al.

(Circuit Court, W. D. Tennessee. August 17, 1897.)

1. FORECLOSURE SUIT—PLEADING—INNOCENT PURCHASER.

Averments in a bill for the foreclosure of a mortgage, filed some time after maturity of the bond secured, that plaintiffs are the owners of such bond, and that it was assigned to them by the payee for value, are insufficient to give them standing as innocent purchasers before maturity without notice of defenses.

2. SAME—SUFFICIENCY OF PLEA — STATUTES REGULATING FOREIGN CORPORATIONS.

A plea to a bill for the foreclosure of a mortgage which avers that the mortgage contract was made in Tennessee, that the mortgagee was a foreign corporation which had not complied with the requirements of the statutes to entitle it to do business in the state, that it had opened an office in the state for the purpose of making loans, and securing the same by mortgages of lands in the state, and had been, and then was, doing "an extensive loan and mortgage business" throughout the state, does not sufficiently plead facts showing that the making of the contract in suit was not an isolated transaction, or that the corporation was "carrying on business" or "attempting to do business" in the state, within the prohibition of the statutes.

3. FOREIGN CORPORATIONS—REGULATION BY STATE—"DOING BUSINESS" IN THE STATE.

Where a foreign corporation, which has not complied with the statutes of Tennessee by filing its charter, etc., through any agency whatever, makes a loan of money to a citizen of Tennessee, which the latter contracts to repay at the domicile of the corporation, and secures by a mortgage on land in the state of Tennessee, such transaction does not constitute a "doing of business" by the corporation in the state of Tennessee, within the prohibitory and penal provisions of the statute.

4. FEDERAL COURTS—CONSTRUCTION OF STATE STATUTES—RULES OF DECISION.
   While federal courts follow the construction of a state statute by the courts of the state, they are not required to adopt a construction based on implications from the language of a judicial opinion.

5. CONTRACTS—LAW GOVERNING—INTENTION OF PARTIES.
   Where a citizen of Tennessee and a corporation of Missouri entered into a contract which would have been invalid under the laws of Tennessee, but valid under those of Missouri, and by its terms made it a Missouri contract, and to be there performed, it will be presumed that they intended it to be governed by the laws of that state.

6. SAME—EFFECT OF MORTGAGE ON PLACE OF CONTRACT.
   A contract for a loan of money and its repayment, evidenced by a bond dated and payable in Missouri, is not rendered a Tennessee contract by the fact that the debt is secured by mortgage on land in that state.

7. FOREIGN CORPORATIONS—STATE REGULATION—MORTGAGES.
   The provision of the statutes of Tennessee prohibiting foreign corporations, unless they comply with its requirements, from owning or acquiring property within the state, do not render invalid a mortgage on lands within the state securing a valid debt to such a corporation.

8. SAME—STATUTES OF TENNESSEE CONSTRUED.
   Under Laws Tenn. 1877, c. 31, and Laws 1891, cc. 95, 122, regulating foreign corporations "doing business" in the state, a corporation is to be considered as doing business in the state only where it becomes in a sense domesticated therein, subject to be sued in the courts of the state, and responsible to its citizens as are domestic corporations.

9. SAME—FAILURE TO COMPLY WITH STATE STATUTE—EFFECT OF SUBSEQUENT COMPLIANCE ON CONTRACTS.
   Under the Tennessee statutes requiring foreign corporations to comply with certain conditions to entitle them to do business in the state, a contract made by a foreign corporation which had not complied with the conditions becomes enforceable on a subsequent compliance.

10. FEDERAL COURTS—CONSTRUCTION OF STATE STATUTES—RULES OF DECISION.
    Federal courts are not bound by the construction of a state statute by the courts of the state, as applied to contracts entered into before such construction was adopted.

11. EQUITY—DEPOSIT IN COURT AS TENDER—POWERS OF COURT.
    Where a defendant in a foreclosure suit before answer or plea voluntarily pays into court a sum as a tender, with an admission that such sum is due, and without imposing conditions as to the deposit, the court has power to refuse to permit the withdrawal of the money, and to order it paid to the plaintiff as a payment pro tanto on the mortgage debt, though defendant by his pleading has put in issue the validity of the mortgage contract. Such order, however, will be made without prejudice to the right of defendant to make his full defense.

In Equity.

## Hearing on Plea.

### (August 17, 1897.)

The bill alleges that the widowed defendant and her husband in his lifetime executed a deed of trust to the plaintiff Jarvis, now a citizen of the state of New York, whereby was conveyed a tract of land of 484 acres situated in Haywood county, Tenn., in trust to secure to the Jarvis-Conklin Mortgage Trust Company the payment of a bond for $6,000 executed and delivered by them for money loaned, due five years after date, with interest payable semiannually on the 1st days of February and August. There are no distinctive allegations in the bill setting forth the tenor and effect of the bond, but it is made an exhibit to the bill, and appears to be a coupon bond by which, five years after date, the obligors promise to pay to the order of the Jarvis-Conklin Mortgage Trust Company, "at its office in Kansas City, Missouri," $6,000, with interest at the rate of 6 per cent. per annum, payable semiannually according to the tenor and effect of the interest notes thereto attached, and of even date therewith. Then fol-

lows this recital: "This note is given for an actual loan of the above amount, and is secured by a trust deed of even date herewith, which is a first lien on the property herein described." The paper is dated at Kansas City, Mo., August 1, 1891, and signed by William E. Capell and Lezinka Capell. Then follow, in the inverse order of their numbers, the four unpaid coupons, each for the sum of $180, No. 10 of which reads as follows:

"On August first, 1896, for value received, we promise to pay to the Jarvis-Conklin Mortgage Trust Company or bearer, at the office of said company in Kansas City, Missouri, one hundred and eighty dollars, for interest due on a principal note of six thousand dollars. This coupon note bears interest at the rate of six per cent. per annum after due.

"[Signed]
                                         Wm. E. Capell.
                                         "Lezinka Capell.

"Dated Kansas City, Mo., August 1st, 1891."

The others are in the same form and words, except as to payment dates.

The bill alleges that "said bond is now the property of complainants Cæsar and Fowler, is overdue and wholly unpaid, together with interest thereon payable semiannually from August 1, 1894." Cæsar and Fowler are British subjects, complainants in the bill along with Jarvis, the trustee. The bill alleges that the Jarvis-Conklin Mortgage Trust Company, the payee in the bond, was a corporation organized and existing under the laws of the state of Missouri, with its principal office in Kansas City, in that state, and then avers that, "being such, was the owner of said bond, and assigned and delivered the same to these complainants for value." The bill again alleges that the obligors have not paid any part of the principal and interest, except as before mentioned, and contains other allegations not necessary now to be noticed. The bill does not set out the tenor and effect of the deed of trust, except so far as to state that it was made to secure payment of the bond above mentioned; but it also is made an exhibit to the bill, and prayed to be taken as a part of it. From its inspection in aid of the bill, it appears to be an indenture between William E. Capell and his wife, Lezinka Capell, of the county of Haywood and state of Tennessee, and Samuel M. Jarvis, trustee, of the county of Jackson and state of Missouri, by which they recite that they "are justly indebted unto the Jarvis-Conklin Mortgage Trust Company in the sum of six thousand dollars, borrowed money, as is evidenced by their note of even date herewith for the sum of six thousand dollars, due and payable on the first day of August, 1896, with interest at the rate of six per cent. per annum from date until maturity." It also recites that the interest payments are evidenced by 10 coupons, and that said note and coupons are payable to the order of the Jarvis-Conklin Mortgage Trust Company at its office in Kansas City, Mo. In the usual form, the instrument then conveys the 484 acres of land in Haywood county by metes and bounds to said trustee or his successors, in trust, forever, releases claims of homestead and dower, waives the equity of redemption, and states the trust to be that in case of default in the payment of the indebtedness, or any part thereof, according to the tenor and effect of the bond and coupons, on the application of the legal holder of the note, it shall be lawful for the trustee to sell the premises upon certain named conditions, and place the proceeds to the payment of costs and expenses of executing the trust, including the attorney's fee of $600, compensation to the trustee, and all sums paid for taxes, insurance, assessments, and charges to protect the title, and finally to the payment of the principal and interest due upon the note and its coupons. The bill prays in the ordinary form for a foreclosure, for an account, and application of the proceeds of the sale that is to be made under judicial decree according to the tenor and effect of the deed of trust itself.

The defendants appeared, and on the 5th day of June, 1897, filed their plea, by which it is averred that the Jarvis-Conklin Mortgage Trust Company at the time of the making of the loan and the execution of the mortgage was a foreign corporation organized and chartered under the laws of the state of Missouri, and that at that time, to wit, August 1, 1891, it had not filed a copy of its charter with the secretary of state of the state of Tennessee, and had not caused an abstract of same to be recorded in the register's office of Haywood

county, Tenn., as required by the acts of the legislature of Tennessee (chapter 122 of the Acts of 1891 and chapter 31 of the Acts of 1877 of said state), although the said Jarvis-Conklin Mortgage Trust Company was at that time doing business in said state and in the said county of Haywood in violation of said acts (the said company having opened an office in the city of Memphis, Shelby county, Tenn., for the purpose of making loans in Haywood and other counties throughout the said state, and securing the same by mortgages and deeds of trust on lands situated in said counties in the said state), and that the said company was in fact at that time, before, and after, doing an extensive loan and mortgage business throughout the state, and also did and was doing a large business in the said county of Haywood, through the said local agencies, and in violation of said acts, and that the loan herein sued on was made through the said agencies, and in violation of said acts (the said loan being negotiated in Haywood county, Tenn., where the said William E. Capell and wife, Lezinka Capell, lived and resided, and where they executed the bond and coupons, and where they received the money for the same, and where the lands are situated which are secured in the deed of trust, and the said trust deed being also executed and acknowledged in this state); that the said company, although it did business "as above set out" from 1890 to the year 1893, did not comply with the said act of 1897 (chapter 122) until the 30th of March, 1892, when a copy of its charter was filed with the secretary of state, and on May 16, 1892, when an abstract of the same was filed in the register's office of Haywood county, Tenn.; that the said loan with its trust deed, bond, and coupons, set out and exhibited with complainants' bill, was therefore null and void; that the legislature of Tennessee, by an act of 1895 (chapter 119), extended the time in which foreign corporations having made loans in violation of said act could file their charters, and that complainants, if entitled to recover in this case at all, are only entitled to recover under and by virtue of said act of 1895 (chapter 119), and that under this act no suit can be brought to recover thereunder within two years from the passage thereof, to wit, May 10, 1895, and therefore May 10, 1897, was the earliest possible day in which complainants' suit could have been legally instituted, and the same, having been brought on April 22, 1897, was therefore premature, wherefore the defendants pray that the same may be abated and dismissed, and demand judgment of this honorable court whether they ought to be compelled to make any answer to said bill of complaint, and pray that they may be hence dismissed with their reasonable costs in this behalf. On the 9th of June, 1897, the minor defendants, who are joined in the foregoing plea by their guardian ad litem, filed a separate plea in all respects the same as that which is above set out, the two being copies of each other.

Scruggs & Henderson, for plaintiffs.
Lee Thornton, for defendants.

HAMMOND, J. (after stating the facts as above). The pleas in this case are somewhat inartificial. They are, in the first place, without leave of the court, double, inasmuch as they set up matter both in bar and in abatement. They also do not within themselves state all that is necessary to render the pleas a complete equitable bar to the case made by the bill, by clear and distinct averments of the facts themselves, but deal mostly in mere conclusions of fact and law drawn by the pleader from the undisclosed circumstances or supposed facts of the case. Also they ignore certain material facts stated in the bill, bearing upon the issue tendered by the pleas. For instance, it appears by the bill that the note and coupons were dated at Kansas City, Mo., and were to be paid there; also, it appears by the deed of trust that it was given for a note and coupons payable to the Jarvis-Conklin Mortgage Trust Company at its office in Kansas City, Mo.; and thus,

upon the very face of the contract itself, both as to the indebtedness and the security, it is recited that the obligation was to be performed in the state of Missouri. These averments are not traversed by the plea nor any answer accompanying it, nor are there any averments of either plea or answer by way of confession and avoidance of the effect of these acknowledged statements in the bill; and finally, in the averments themselves that are relied upon as showing that in this transaction between the Jarvis-Conklin Company and the defendants' intestate there was a violation of the statutes of Tennessee which have been pleaded in defense, there is almost a total absence of any statement of specific and definite facts which might show that the Jarvis-Conklin Company did or attempted to ao business in the state of Tennessee without having complied with the provisions of the statute which is relied upon as a defense. It is stated that it was at that time doing business in the state of Tennessee and county of Haywood, in violation of the acts; but this is only a conclusion of fact or an inference drawn by the pleader, and not a statement of any fact itself. It is stated that the company had at that time opened an office in the city of Memphis for the purpose of making loans in Haywood and other counties throughout the state, and securing the same by mortgages and deeds of trust; but, again, this is not an averment of specific facts that would enable the court to see from the recitals of the plea itself that an office was opened in the city of Memphis, and the nature and character of that office, and the other facts from which it is assumed that it had a purpose to make loans, and secure the same upon mortgages throughout the state. Again, it is said that it was before and afterwards doing an extensive loan and mortgage business, and also did and was doing a large business in the county of Haywood, through the said local agencies, without stating any particular facts from which the court can see that the business done was a loan business and a mortgage business, and how it was done through the local agencies. There is no averment of fact in this, but only the inference which the pleader draws from what he seems to know or to have been informed concerning the business of the Jarvis-Conklin Mortgage Trust Company; and yet again it states that the loan herein sued upon was made through said agencies, and in violation of said acts, which is the very question to be determined by this litigation, both as to the fact and law. It is not stated specifically how the loan was made through the agency, who was the agent, what was the character of his agency and the extent of his authority, what he did, how he did it, where he did it, and all the circumstances that would show upon the face of the plea that the business was done in the state of Tennessee. It is next said that this loan was negotiated in Haywood county, Tenn., where the defendants resided, and where they "executed" the bond and coupons sued on, and where they "received" the money for the same. This averment does not show the facts which are described as "negotiations," does not show what facts are relied upon to sustain the averment that the bond and coupons were executed in Tennessee, nor how the money was received,—whether it was by draft payable at Kansas City, Mo., or New York, or elsewhere, which for their convenience was cashed in Tennessee at their request by some banker

who was willing to do that, or whether it was directly paid over to the makers of the note by some agent of the company within the state of Tennessee. In other words, almost every averment of this plea in respect of this transaction is a mere general conclusion of fact drawn by the pleader, and not the averment of any specific act done by the parties or their agents. The same may be substantially said about most of the other averments in the plea, and, taken altogether, it would be entirely competent to decide this case upon the insufficiency of this plea in respect of its form; for it surely does not comply with the description of sufficient pleas as laid down in Mitf. Eq. Pl. (6th Ed.) 341, 351, et seq., and 1 Daniell, Ch. Prac. (5th Ed.) 684 et seq. But these authorities show that courts of equity are very liberal in the matter of pleading, and do not deny to the parties the defenses they make because of any mere defects of form; and as the bill itself is also quite inartificial, depending in many of its material averments upon the assistance which it gets by an inspection of the exhibits to the bill, rather than the averments contained in it, and a decision on that ground would only result in amendments to the bill and the pleas, I have concluded to determine the questions at issue without reference to these inconvenient defects in the pleadings.

Plaintiffs rely in argument upon a defense of innocent purchaser without notice, sustained by the case of Lauter v. Trust Co., —— Fed. ——, in the United States circuit court of appeals for the Sixth circuit, and decided May 17, 1897, which would be an all-sufficient defense if it were available to complainants on the pleadings in this case, but it is not. The bill by way of anticipation nowhere states facts entitling complainants to claim as innocent purchasers before maturity for value, without notice. It does aver that the bond is the property of the plaintiffs Cæsar and Fowler, and in another place that the Jarvis-Conklin Mortgage Trust Company, being the owner thereof, assigned and delivered the bond and coupon to these plaintiffs for value, but it does not aver that this assignment was in due course of business and before maturity; and, as the bond became due on the 1st of August, 1896, we cannot say but that this assignment was within the nine months from that maturity to the filing of the bill. Again, the bill does not aver that at the time of that assignment, whether before or after maturity, the plaintiffs Cæsar and Fowler, who are now the holders of the paper, had no knowledge of the fact that the Jarvis-Conklin Mortgage Trust Company, at the time the loan was made, being a corporation of the state of Missouri, had not filed a copy of its charter with the secretary of state, and had not caused an abstract of the same to be recorded in the register's office of Haywood county, Tenn., where the land lies, as required by the acts of the legislature which are set up in the plea. If the bill had averred these facts, the plea must have been accompanied by an answer denying them, before it could be a defense; but as there was nothing in the bill showing that the holders were innocent purchasers for value before maturity, without notice of the infirmity, it was not required that the plea should be accompanied by an answer denying these alleged facts, nor can we know now what the real facts are in that regard. In the Lauter Case, above cited, it

appeared that the note was assigned before maturity, in due course of business, for value, and without any notice of the infirmity, and it has therefore no application here; and we must decide this case without regard to that defense against the alleged illegality of the transaction. It may be open to the plaintiffs to set up the facts only by way of amendment to the bill, since the abolition of special rejoinders to pleas in equity which have fallen into disuse. Mitf. Eq. Pl. 382. But, until this be done, we need pay no further attention to that defense.

This plea broadly assumes that every business transaction having any connection of fact with this state by a foreign corporation which has not complied with the statutes is the doing of business, or attempting to do business, in contravention of them, and that all contracts arising out of such transactions are null and void. This cannot be so, and a properly drawn plea should show, either directly or by its necessary implications, that the particular contract involved in the litigation is not within any category of transactions not comprehended within the prohibitions of the statute, whatever they be. For instance, the statute cannot constitutionally apply to any transactions within the category of foreign interstate commerce, as was asserted by two of the justices in their concurring opinion in the case of Manufacturing Co. v. Ferguson, 113 U. S. 727, 736, 5 Sup. Ct. 739, nor within the category of an isolated transaction, as was decided in that case by all the other justices of the court. In Paul v. Virginia, 8 Wall. 168, it was decided that the transaction of insuring against fire is one concerning an instrumentality of commerce, and not commerce itself; and the court there cites approvingly the case of Nathan v. Louisiana, 8 How. 73, and gives the opinion in that case a somewhat more extensive application than its technical limitations as a precise adjudication would require, from which it may be assumed in favor of the defendants here that, if dealing in the purchasing and selling of foreign bills of exchange is not foreign or interstate commerce, dealing in bond and mortgage securities, by either lending on them originally, or buying and selling them afterwards, is also not interstate commerce, particularly as we have been cited to no case holding otherwise. But it does not appear in this plea by any negative averment that this was not an isolated transaction of its kind, as was that in Manufacturing Co. v. Ferguson, supra. It is true that the plea avers in the general way already stated that this company was doing an extensive "loan and mortgage" business in the state, but it does not aver that the specific nature and character of that other business was just like this contract, not even by saying that the other transactions were similar to this, or that they were analogous in all substantial respects to that we have here. It need not have averred each particular transaction to be given in evidence in support of this plea, perhaps, but it should have shown that the other business was the same as this business, or sufficiently like it to take it out of the category of isolated transactions; and therefore we cannot say from this plea, or from anything we have before us, that this was not a single transaction like that in Manufacturing Co. v. Ferguson, supra. For anything that appears definitely from the

allegations of the plea, it may have been.    Doubtless the plea could have been framed to show that the company was making contracts of loan and mortgage other than this that were, in their legal effect and character, Tennessee transactions or Tennessee contracts, if that be the fact; or, sustaining the broadest construction of the statute in favor of the defendants, it might have shown that this foreign corporation was doing, in any way whatever, any other business whatever within the scope of its charter, which amounted to "carrying on business" in Tennessee, or "attempting to do business" in Tennessee, to use the language of the statute, so that it was really not engaged in a single transaction, but in many, all in defiance of the prohibitions of the statute.    But this plea does nothing of the kind. On the contrary, it conveniently and gratuitously presupposes that this particular transaction was a Tennessee contract, and that all and any business that could be done by this company concerning lands in this state could only be done in violation of the statute, without pleading any other circumstance concerning the contract to make that fact plain.    In other words, the plea assumes that a foreign corporation which has not complied with the regulations of the statute cannot have a loan and mortgage transaction with a citizen of Tennessee, conveying lands in Tennessee, without the business being done in that state.    This is a mistaken assumption, and a plea based upon it cannot be a sufficient defense as showing the invalidity of a contract arising out of a violation of the prohibitions of a statute.    This is made entirely plain by the decision of the supreme court of Tennessee in the case of Loan Co. v. Cannon, 96 Tenn. 599, 36 S. W. 386.    In that case, Cannon, a citizen of Memphis, had a loan from a building and loan association in the state of Minnesota, secured by a deed of trust upon lands in Shelby county, Tenn.    He and his wife executed a joint note to the company, and, to use the language of the opinion, "this note was dated and made payable at Minneapolis," and provided for the payment of 5 per cent. premium and 5 per cent. interest, and for 10 per cent. attorney's fee in default of payment of the note.    One of the defenses set up there was that the Minnesota corporation had not complied with the statutes we now have under consideration, and therefore the transaction was void, but that was sufficiently answered by the showing made that the loan was effected prior to the passage of the act of 1891, and was therefore not within its provisions.    But another defense was made, that the transaction was usurious, in violation of another penal act of Tennessee which makes void any note agreeing on its face to pay more than the lawful interest allowed; and in reply to that defense the supreme court of Tennessee says that although the note stipulates on its face to pay 5 per cent. interest and 5 per cent. premium, as it was dated and made payable at Minneapolis, and the interest and premium were payable at the office of the company in Minneapolis, Minn., it was a Minnesota contract, and, being expressly authorized by the charter of the company and by the laws of that state, it was valid.    In other words, being a Minnesota contract it was not amenable to the penal laws of Tennessee.    Precisely the same reasoning would have led the court to say that it was not amenable to the penal

laws of Tennessee in regard to the prohibition laid upon foreign corporations from doing business in Tennessee, for the simple reason that the making of such a contract is not doing business in Tennessee, but in Minnesota. The court did not find it necessary in that case to decide this, because there was another sufficient answer to the defense set up under the later penal statute of Tennessee, that it was made before the statute was passed. Counsel do not cite and I have found no case in Tennessee directly deciding this point, but for my part I am unable to see any reason why that contract should have been exempt from the penalties of the usury laws of Tennessee, any more than it should be exempt from the penalties of the foreign corporation act of 1891. They are both penal statutes, both based on public policy which the legislature has declared for the protection of the citizens of Tennessee in their business dealings, and, so far as I can see, are, in respect of this question of invalidity, precisely the same in their nature and character; and, if the fact that the contract is to be performed in the state of the domicile of the foreign corporation relieves it from the penalties in the one case, I do not see why it should not relieve it in the other. It does not appear in the Case of Cannon where the "negotiations" for the loan were had, whether in Tennessee or in Minnesota; but it is altogether inferable that Cannon and his wife did not go to Minnesota to make the negotiations, but that it was done either through the agency of the United States mails, or through the agency of other representatives of the foreign insurance company in the state of Tennessee. The trustee in the mortgage was a citizen of Tennessee and of Shelby county, and, to one as familiar as the writer of this opinion is with the citizens of this county, it is not an unfair inference that he was likewise the agent through whom the loan was negotiated, and that that fact would appear by an inspection of the full record in the case, as it rests in the chancery court of Shelby county or the supreme court of Tennessee. We may take judicial notice of the fact that ordinarily the business of the county is done in that way, and, while I would not extend the facts of the case beyond the recitals of the reporter, I think, from the nature and character of the transaction, we may at least suggest that there is nothing in the case to show that the negotiations preceding the loan in that transaction were very dissimilar to those which are set up in this plea.

In another case pending before me, involving these Jarvis-Conklin Mortgage Trust Company mortgages, counsel for the company has cited an unreported case of Partridge & Wife v. The Jarvis-Conklin Mortgage Trust Company, arising in the chancery court of Tennessee, and going by appeal to the supreme court of Tennessee, from the record of which it appears that that company had made a loan to Partridge and wife, and taken a mortgage very similar, if not precisely like this. The trustee advertised the property for sale on default of payment, and Partridge and wife filed a bill to enjoin the sale upon the ground that the contract was usurious. By the agreed statement of facts it was admitted that 10 per cent. interest was charged, although the papers were written upon their face to bear only 6 per cent.; but it was also agreed that, by the laws of the state of Mis-

souri then in force, it was lawful to charge 10 per cent. It was also agreed that the application for the loan was made to one W. A. Smith, the agent of the Jarvis-Conklin Mortgage Trust Company at Memphis, Tenn., and that he forwarded the application to the home office, at Kansas City, Mo., where the loan was allowed by the company, acting through its proper officers at Kansas City. It was further agreed that the notes, though signed in Memphis, were dated at Kansas City, Mo., and that the money was paid in Kansas City, Mo., through the banks, upon a draft given by the agent at Memphis. Upon this agreed statement of facts the chancellor dissolved the injunction, and upon an appeal to the supreme court the judgment was affirmed. There were no opinions prepared and filed, but it is understood that both courts based the judgment upon the fact that the contract was not made in Tennessee, but was made in Kansas City, Mo. It is said in the brief of counsel furnishing us with the abstract of this case that there are two other cases involving Jarvis-Conklin Mortgage Trust Company mortgages of similar import to the last-mentioned Partridge Case; the court holding that the contract was not complete until the company agreed to it in Kansas City, Mo., and that it was a Missouri contract. It is greatly to be regretted that we have not been favored with opinions by the supreme court of Tennessee in these cases, but, presumably, they base their judgment upon the case of Loan Co. v. Cannon, 96 Tenn. 599, 36 S. W. 386.

One of the latest and most extensive writers upon the law of corporations in several chapters has treated of the relation of foreign corporations to other states in which they do business, with or without permission, express or implied; and he has gathered and classified the most important and modern cases upon that subject, with a general tendency in his text to support the most absolute powers of prohibition on the part of the states as against foreign corporations. 6 Thomp. Corp. §§ 7875–7984. But one cannot read the cases relating to the restrictive legislation of the states without at once observing that the courts everywhere are doing all that they can to confine this absolutism, which nowhere else exists under our laws, within the reasonable bounds of due regard for the ordinary principles of justice, at least. It may be that the absolute power of a state to prohibit foreign corporations from doing business within that state when they are not engaged in strictly interstate commerce will enable the legislature of a state to say that no contract made by a foreign corporation with a citizen of that state, or concerning land situated in that state, shall be valid, or that it shall not be valid except upon compliance with arbitrary conditions prescribed at the unrestrained will of the legislature. But I am satisfied that the legislation of the state of Tennessee which we are now considering has not gone to that extent, and yet we must go precisely to that limit in order to sustain this plea, for that is the very thing which it avers. For my part, I am not willing judicially to concede this, notwithstanding the broad language of much of the writing upon this subject,—that it is within the power of the legislature of the state of Tennessee to annul a contract made by one of its citizens with a foreign corporation simply because the parties to the contract deal with each other across the state lines;

each remaining within his own domicile, and using the ordinary instrumentalities of intercommunication for the purpose of reaching their agreement; not upon any theory that this is doing business with a foreign corporation which may be excluded from any given state other than that of its domicile. The state may prohibit the foreign corporation from becoming domesticated within its boundaries; it may prohibit it from residing there, in the sense that it establishes its working agencies within that state, and it may use all the appliances open to governmental power to exclude such agencies; it may close its courts to the foreign corporation, deny it all protection of its laws, punish it with any instrumentality of governmental force available for punishing those who violate the prohibitions of the statutes; and it may do all this under circumstances that, if the corporation were an ordinary citizen, might provoke retaliation by his government, or even provoke war, as against those barbarians upon whom the ordinary intercourse of civilization is sometimes imposed by war. But it does not follow from all this that in the relations that exist between our states, as members of a Union, and under a common constitution, the states can make absolutely null and void all contracts that are made between a corporation of one state and a citizen of another state, so that the courts sitting within the boundaries of the latter shall be under a prohibition to enforce the contract. If the courts of the state are required to do this, and to an extent that the constitution of the United States would not permit the obligation of the contract to be interfered with if the stockholders had been acting jointly in their individual capacity, or as partners of each other, in the exercise of that freedom of citizens of the states to contract and trade with each other which it is the object of our constitution to secure, there is yet no authoritative decision going that far in its adjudication, whatever language may be used in writing about it. Suppose a corporation of the state of Missouri opens communication by mail with a citizen of Tennessee to do precisely that which was done in this case, and it should result in precisely the contracts that were made. Would not the postmaster general, the postmaster at Kansas City, the postmaster at Memphis, and all the letter carriers active in the operation, be human agencies of the foreign corporation for doing the business in the state of Tennessee? Would they not be as much the agents of the foreign corporation, in offering or accepting the loan, and in conducting the particular negotiations, as any other duly-accredited agents would be who are temporarily sent into the state of Tennessee, or reside there, for the purpose of making these negotiations, and would not the foreign corporation, through these epistolary agencies, be doing business in Tennessee as much in the one case as it would in the other? Or suppose the citizen of Tennessee goes to Missouri, and there executes and delivers the bond and mortgage, or, first executing them in Tennessee, he takes them to Missouri for delivery. Would not this be also doing business in Tennessee? Now, under any or all of these circumstances, could the legislature of Tennessee say that this contract should be null and void? It has the same control over foreign corporations, to prohibit the doing of business in the state, in the one case as in the other, if we are to accept the absolutism of this doctrine to

its utmost limits, and it is just this power that is invoked in aid of this plea, with the practical result, if allowed, that a citizen of Tennessee would be permitted to take from citizens of Missouri, acting in a corporate capacity in that state, a large sum of money, appropriate it to his own use, and refuse to repay it according to the terms and tenor of his own contract, which is neither hurtful in itself, nor in any sense immoral or wrongful in its uses or purposes. Such a right of annulment must rest solely and entirely upon the most arbitrary exercise of unrestrained governmental power, which exists in no constitutional country, unless it may be as against corporate entities.

Certainly the courts will not aid either party to such a contract in escaping its obligations upon any doubtful construction of the legislation, and not until the legislature of Tennessee has said in plain and unequivocal terms that a bond dated at Kansas City, Mo., with the contract of loan to be performed there, or the security only incident to that contract upon lands in Tennessee, is to be held null and void because the foreign corporation has not previously filed its charter with the secretary of state, and caused an abstract thereof to be recorded in the county where the land lies; or not until the supreme court of the state has, by an unequivocal declaration, announced that such a contract is within the equivocal prohibitions of the statute, will the courts of the United States import such prohibitions into the statute by any implication or doubtful or elastic words. It is quite true that that which is prohibited cannot be enforced, and that contracts made in contravention of lawful and constitutional legislation may be invalid, if the legislature says so, either expressly or by necessary implication; and it is the duty of all courts, state and federal, to give effect to this principle, but not until the effect of the prohibition is beyond all controversy and doubt. What we hold here is that where a foreign corporation, which has not complied with prohibitory and penal statutory regulations about filing its charters and abstracts in the state of Tennessee through any agency whatever, makes an agreement with a citizen of that state to lend him money, which the citizen of Tennessee agrees to repay to the foreign corporation at its own domicile, and, to secure that payment, gives a mortgage upon lands situated in the state of Tennessee, there is no "carrying on of its business," or "acquiring or owning property," or "doing" or "attempting to do any business," within the state of Tennessee, according to the tenor and effect of this statute. That is doing business in Missouri with a citizen of Tennessee, or it is the "doing of business" in the state of Missouri by a citizen of Tennessee with a corporation created by the laws of Missouri, and not amenable because of this transaction to the authority of the state of Tennessee, or at least the legislature of the latter state has not attempted by this act to annul such a contract as that. The cases cited from the supreme court of Tennessee by counsel do not sustain the position that such a transaction is doing business within the state, within the purview of any of these statutes. The supreme court of Tennessee considered them in the case of State v. Phœnix Ins. Co., 92 Tenn. 420, 21 S. W. 893, deciding that foreign fire insurance companies which had already complied with other laws of Tennessee especially prescribing regulations for the government of domes-

tic and foreign insurance companies establishing themselves in Tennessee were nevertheless required, under these general acts governing all corporations, to comply with their regulations about filing their charters and abstracts of them in the several counties of the state where they did business, and that they were liable to the privilege taxes and official fees imposed upon companies complying with these general acts. The opinion claims for the legislative power the utmost absolutism over foreign corporations, but the facts of the case show that those companies were confessedly doing an established business in Tennessee in the same manner that domestic insurance companies do their business within the state. In reaching this conclusion the court overruled a contrary opinion of one of the circuit judges, who is now one of the justices of the supreme court; and the then chief justice of the supreme court, who is now one of the United States circuit judges for this circuit, dissented; showing that judicial opinion was not unanimous in respect of this construction of the statutes. The case of Lumber Co. v. Thomas, 92 Tenn. 587, 22 S. W. 743, always relied upon in favor of the invalidity of these contracts, was one where there was a contract for the building of a house in the city of Memphis, Tenn.; and, the contractor having abandoned it, the owners undertook to complete the house themselves. A foreign insurance company, using the language of the court, "furnished lumber and material in the construction of the house for a price amounting to $1,249." It does not appear from the report of the case how this building material was furnished by the foreign insurance company, nor whether it might have been interstate commerce, such as two of the justices thought the machinery furnished in Manufacturing Co. v. Ferguson, 113 U. S. 727, 5 Sup. Ct. 739, was, nor whether it was an isolated transaction, as the other justices decided it to be in that case. Indeed, the whole report is very bare of any information about the nature and character of that transaction; but from the fact that the defense of interstate commerce was not dealt with by the court, and from the fact that it does appear by the report that the lumber company had subsequently complied with the statutes by registering its charter and abstracts as required by the act of 1891, seemingly a short time after the building materials were furnished, it must be inferred that it was a foreign corporation engaged in the domestic commerce of dealing in lumber in Tennessee. The act of 1891 went into effect on the 26th of March, and the lumber company registered its charter and abstracts on the 5th of July, 1891; and, although the dates do not otherwise appear, it must have been that this contract for furnishing the materials was made between those dates, and it therefore is to be taken, in considering the effect of that opinion, to have been the fact that the foreign corporation was engaged in domestic commerce and doing an established business in Tennessee as other lumber dealers do such business,—wholly within the state. This was the view taken of the effect of that decision in the case of Lauter v. Trust Co., supra, by the circuit court of appeals for the Sixth circuit, and in the case of Railroad Co. v. Evans, 14 C. C. A. 116, 66 Fed. 809, 816, by the same court. It was held in the last case that the statute was not broad enough to impose a forfeiture of property already acquired by a foreign corporation through a prohibition of

the sale of that property, or an annulment of a contract to sell it without having first complied with the registration regulations of the act. The case does not deny to the legislature of Tennessee the power to do such a thing as that, but simply decides that it has not been done. It takes occasion to call attention to the broad language of the supreme court of Tennessee in the case of Lumber Co. v. Thomas, and refuses to be governed by the implications of argument based upon such a broad declaration of an agreed principle, and to comprehend within the authority of the case such a forfeiture as was insisted upon in that case, very much as we decline here to apply the agreed principle to the annulment of a contract to be performed outside of the state of Tennessee. If all should agree that it is within the power of the legislature, by reason of its control over foreign corporations, to impose forfeitures such as that which was insisted upon in the case of Railroad Co. v. Evans, or to declare the annulment of a contract like that we have in this case, it is sufficient to say that until the statute has, in explicit and express language, declared such forfeitures and annulments, the courts will not do this upon any implications of loose and indefinite language and phraseology like that of "carrying on" or "doing business within the state." And if it be conceded, as we do concede, that it is the duty of the federal courts to follow the construction of the state statutes by the courts of the state, and that such results as we have just mentioned may be reached by implication from the words of the statute, without express language, yet, until the supreme court of the state has definitely declared that it is a proper construction of the statute to include such forfeitures and annulments, the federal courts cannot be bound to declare them upon any implication based on the language used in judicial opinions. It was conceded in Bank v. Matthews, 98 U. S. 621, that such prohibitions may be raised by implication, without express language in the statute, where it was clearly the intention of the legislature to include them; but at the same time it is said that if the statute be silent upon such a subject, as it would be easy for the legislature to declare in express terms such a result, it is hardly to be believed that they have that intention, or have left the question to be settled by the uncertain result of litigation and judicial opinion, and, further, that a court of equity is always reluctant, in the last degree, to make a decree which will effect a forfeiture, in the absence of the most imperative command of the legislative will. Therefore we cannot be asked, because of the emphatic language used in this opinion of Lumber Co. v. Thomas, to go beyond the adjudication, and declare forfeitures and annul contracts which are not distinctly within the adjudication itself. The supreme court of Tennessee does not say in this case that it was the intention of the legislature to declare null and void contracts made with a foreign corporation, to be performed within the limits of its own domicile, because they were made by citizens of Tennessee without its charter and abstracts having been registered as required by the act. Neither has it made such a declaration in the case of Insurance Co. v. Kennedy, 96 Tenn. 711, 36 S. W. 709, so much relied upon in argument. The insurance company in that case had been doing business in Tennessee by establishing agencies, just as domestic insurance companies do business in that

state, and had a contract with its agents at Memphis that they were personally to be responsible for uncollected premiums. After the passage of the act of 1891 it declined to comply with that statute, but for a while its business went on, notwithstanding the act, until the agents were indebted to their company for uncollected premiums, and upon settlement gave their notes for the amount. Being sued on the notes, they set up the illegality of the transactions out of which the premiums arose, and the defense was allowed to be available. But here, again, it appears beyond any controversy that the company was doing business in Tennessee as domestic corporations do their insurance business, and there is nothing in the case to show that the supreme court would have annulled any such contracts as we have in this case, or would have declared that the statute comprehended such contracts. And even in that case the court is moved to say that, if the agents had actually got the money, they would be required to pay it to the company, and would be estopped to set up the invalidity of the contracts, so as to keep the money (citing the case of State v. O'Brien, 94 Tenn. 79, 28 S. W. 311, as authority for that position); showing, as we have before remarked, that the courts everywhere struggle against the bald injustice of allowing a citizen of the state to appropriate the money of a foreign corporation to his own use through a reliance upon such a prohibition as we have in this case.

We have examined all the other cases cited by counsel, and those cited in those cases, that have considered this statute, in the supreme court of Tennessee,—cases like that of Haworth v. Montgomery, 91 Tenn. 16, 18 S. W. 399, where Mr. Circuit Judge Lurton, then chief justice of the supreme court of Tennessee, said:

"Where a statute has for its manifest purpose the promotion of some object of public policy, and prohibits the carrying on of a profession, occupation, trade, or business, except in compliance with the statute, a contract made in violation of the statute cannot be enforced."

Not one of them establishes any principle that can control our judgment here in favor of the contention of the defendants. It may be said, upon the authority of these Tennessee cases, that that state has placed itself in a group with those which inexorably hold that, if a foreign corporation does business within the state contrary to the prohibitions of its statutes, it will not be allowed to enforce its contracts in the courts of the state (6 Thomp. Corp. § 7950), and that this exclusion applies without regard to any distinction between that which is malum in se and that which is merely malum prohibitum. Ohio Life Ins. & T. Co. v. Merchants' Ins. & T. Co., 11 Humph. 1, 11, and Gibbs v. Gas Co., 130 U. S. 396, 411, 9 Sup. Ct. 553, where Mr. Justice Totten, of the supreme court of Tennessee, and Chief Justice Fuller, of the supreme court of the United States, use almost identical words in considering this distinction. 6 Thomp. Corp. §§ 7955, 7958. Nor do the courts of Tennessee draw any distinction in respect of this between statutes that impose a penalty and those which do not, but take the broad position that, in addition to the penalties imposed by the statute, the courts will not enforce a contract made contrary to its prohibitions, and will not be satisfied with merely enforcing the penalties. 6 Thomp. Corp. § 7958; Perkins v. Watson, 2 Baxt. 173.

83 F.—27

And yet the case last cited is another illustration of the fact that the courts will not extend these penal statutes beyond their clear and explicit commands, whether expressed or implied, and will not give what Mr. Justice Gray has called "ubiquitous effect to a penal law." Wisconsin v. Pelican Ins. Co., 127 U. S. 265, 290, 8 Sup. Ct. 1370. In this last case the state of Wisconsin had recovered a large judgment against a foreign insurance company for doing business in the state contrary to the regulations of the statute accumulating penalties similar to those imposed by this Tennessee act; and the judgment being sued on in the courts of the United States, namely, by original suit in the supreme court itself, the suit was dismissed because to give a judgment for the penalties would be to give extraterritorial effect to the penal laws of Wisconsin. So we say here that to enforce the penalty of invalidity demonstrated by the statute on the construction given to it by the defendants, as to a contract made by a citizen of Tennessee with a foreign corporation to be performed in the state of the foreign company, would be to extend the penal laws of Tennessee to contracts made in the state of Missouri, which surely cannot be done. That Missouri was the situs of the contract, in relation to such penal statutes, we have already shown by citations from the supreme court of Tennessee; and that doctrine is supported by the decisions of other states as well, though it seems that there are decisions to the contrary, at least in the application of the principle to policies of insurance. 6 Thomp. Corp. §§ 7968, 7970; Coghlan v. Railroad Co., 142 U. S. 101, 12 Sup. Ct. 150; Hall v. Cordell, 142 U. S. 116, 12 Sup. Ct. 154; Society v. Clements, 140 U. S. 226, 11 Sup. Ct. 822; Supervisors v. Galbraith, 99 U. S. 214, 218; Cook v. Moffat, 5 How. 295, 307, 314, 315; Pritchard v. Norton, 106 U. S. 124, 1 Sup. Ct. 102; Story, Confl. Laws, § 287.

Whatever conflict of authority there may be on this subject, or whatever confusion in judicial decision, as shown by the cases, it cannot stand in the way of reaching correct conclusions, if attention be paid to the discriminating judgment of Mr. Justice Matthews in the case of Pritchard v. Norton, 106 U. S. 124, 1 Sup. Ct. 102, which has made everywhere quite easy the solution of the difficulties surrounding this subject, and has been frequently reaffirmed by the supreme court of the United States. Coghlan v. Railroad Co., 142 U. S. 101, 12 Sup. Ct. 150. The governing principle is that in every case the validity of the contract is to be determined by that law which, either expressly or presumptively, the parties themselves have incorporated into the contract, as constituting its obligation. There is no hard and fast rule by which the question is to be determined, but the intention of the parties is to be reached, as in other cases, according to the facts and circumstances as they appear in that particular transaction, and they are to be held to have contracted in view of the law of that place which they themselves have selected as the law of their contract, according to its nature; and, wherever there are peculiar characteristics, these are to be considered along with the rest. Here we have the case of a state prohibition, passed on the 26th of March, 1891, imposing onerous and burdensome conditions upon a company which the plea says prior to that time had

been engaged in "doing business in the state of Tennessee,"—whether of the precise character of the transaction we have now under consideration or not does not appear by any averments in the plea, but it may be assumed that the company was engaged in lending money upon mortgages of real estate according to such terms and conditions as the parties might agree upon. Now, let us suppose that a citizen of Tennessee on the 1st of August, 1891, aware of this statute, and the managers of this loan and mortgage company, also aware of it, have in contemplation, on the one hand, that the citizen of Tennessee wishes to borrow of the foreign corporation a large sum of money, to be secured by a mortgage upon his real property in Tennessee, and, on the other hand, that the foreign corporation is willing to lend it if the parties can effectuate the transaction without the violation of this statute, and without incurring its penalties. Is it possible for them to do so? If so, how may they effect such a contract? To do the business in Tennessee by agreeing that it should be performed in that state would be to make it invalid, let us say; while to make it in Missouri, to be performed in Missouri, would make it valid, let us say. Is it not reasonable to suppose that both parties, being honest, and intending honestly to deal with each other, would embody into the contract the laws of Missouri, and make it a valid transaction, as between them, according to those laws, and they were not, presumptively, on the other hand, intending to make it a Tennessee contract, to be avoided and made invalid by a resort to the prohibitions of the statutes of that state,—in the absence of definite proof to the contrary, that they resorted to the state and the law which would give full effect to their contract on both sides? If we then find them making the contract on its face appear to be a Missouri contract, and by its own stipulations providing for a performance in the state of Missouri, is it not conclusive that they were contracting with a view of the laws of the state of Missouri, and not with a view of the laws of the state of Tennessee? And is it not a mere sticking in the bark of the circumstances of such a transaction to say that because these parties stood each within the limits of his own state, and carried on their intercommunications about this contract through any convenient agency that might exist for that purpose, it is a Tennessee contract? Should it be so held merely because one party to the contract resided in Tennessee, and because the agencies used in and about the preliminary negotiations were found operating within the boundaries of the state, and because the money was delivered to him there, if indeed it was in this case? In the case of Pritchard v. Norton, supra, one of the obligors of the bond lived in the state of New York, and the other in the state of Delaware. The bond was executed, signed, and delivered in the state of New York, and possibly through agents of the obligee in that state, just as completely as this transaction can be said, by reason of the particular circumstances mentioned in this plea, to have been executed in Tennessee. By the statute of New York the obligation was null and void for want of consideration to support it, and yet it was held that inasmuch as, from the nature and character of the obligation, it was to be fulfilled in Louisiana, although not so expressed in the

body of the instrument, as it is in this case, that the contract was to be governed by the law of Louisiana, that being the lex loci solutionis; because, presumably, that was the law that was in the contemplation of the parties at the time of the making of the contract. On the authority of that case, and the case of Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 458, 9 Sup. Ct. 469, it was held in Coghlan v. Railroad Co., supra, where the bonds were payable at a future day, both principal and interest, in London, that, in the absence of attendant circumstances to show to the contrary, the parties were contracting with reference to the law of England; the court saying that the law of the place where the contract is signed, or even delivered, can never be the governing law, when the transaction is entered into with an express view to the law of another country, and that, presumptively, if the contrary does not distinctly appear, they have in contemplation that country within which the contract is to be entirely performed. Here the contract was to be entirely performed, as to the payment of principal and interest, within the state of Missouri; and therefore, so far, at least, as the agreement of loan and repayment is concerned, it was wholly a Missouri contract. Does it make any difference that the incidental security of the mortgage was upon lands within the dominion of Tennessee? Surely not, for it is held everywhere that the mortgage or other security goes with the contract, as a mere incident to it; and as stated by our circuit court of appeals in the Lauter Case, supra, the mortgage to secure this note was a mere security, and followed the debt.

It must be admitted that everywhere the law is that the control of a state over land situated within its boundaries is quite absolute, and it may declare its own public policy and its own rules and regulations governing all dealings and all rights of property therein, and surely this statute does say that all foreign corporations not complying with its terms shall not own or acquire any property within the state; but this does not necessarily imply that the state of Tennessee has chosen to exercise the dominion it may have over lands in Tennessee to the extent of declaring that there shall never be any mortgages made to secure obligations to be performed in the other states of the Union unless the foreign corporation shall come here and register its charters and abstracts. Possibly the state has the power to do this, but it is sufficient to say that it has not done so in express words, there is no decision of the state of Tennessee that has construed the statute as doing that thing, and there is nothing in the facts and circumstances of this case to induce any court to make that ruling as one of original instance. It is outside of any manifest purpose, as expressed in the legislation of the state, to so invalidate securities given for the contracts of citizens of the state to be performed in other states; and it is not to be presumed, in the absence of express words or necessary implication, that the state would desire any policy that would prohibit its citizens from borrowing money in other states upon liens on property situated here. The purposes and policies of the statute are fully met by denying to this and other foreign corporations the privilege of coming into Tennessee, by bringing their capital here and making contracts that are to

be performed within this state on both sides, and doing business in the same way and to the same full extent that our own domestic corporations might do in that line of business; but if a citizen of Tennessee should choose to go to the state of Missouri, the state of New York, or elsewhere, and there make a contract to be performed in other places than the state of Tennessee, there is no public policy obviously in these statutes against such a transaction as that. There is nothing wrongful of itself, arising out of the nature and character of the transaction, and therefore the case falls within the principle recognized by the supreme court of the United States in Gibbs v. Gas Co., 130 U. S. 408, 9 Sup. Ct. 553, where the chief justice says that the prohibitions of public law and public policy should not be arbitrarily extended so as to interfere with the freedom of contract; citing Registering Co. v. Sampson, L. R. 19 Eq. 462, where the master of the rolls says:

"If there is one thing which, more than another, public policy requires, it is that men of full age and competent understanding shall have the utmost power of contracting, and their contracts, when entered into freely and voluntarily, shall be held sacred and shall be enforced by courts of justice, and that this is a paramount public policy, and that you are not lightly to interfere with this freedom of contract."

It is not to be supposed that if, in Pritchard v. Norton, supra, the New York citizen had given a mortgage upon land situated in New York to secure the contract which was to be performed in Louisiana, there would have been any different decision, in the absence of the most positive prohibition against the giving of such a security, or that it would have been held that the mortgage was anything more than a mere incident to the contract itself, which would be always valid where the contract was valid, so far as relates to any mere infirmity like this. It may be that, in a certain common and superficial sense, a corporation of the state of Missouri, undertaking to lend money to a citizen residing in Tennessee, secured by a mortgage upon lands in Tennessee, is doing business in that state, particularly where the citizen of Tennessee remains physically within the boundaries of that state, and the preliminary negotiations are carried on with him there through the agencies of epistolary correspondence by the mails, or verbal negotiations with a different class of agents; but in a technical and legal sense the "business" done is the ultimate making of the contract which is the result of the preliminary negotiations. If that is to be performed in Tennessee, it is ordinarily a Tennessee contract, and the business is done in Tennessee; but, if it is to be performed in any other state, the contract belongs ordinarily to that state, and it is "business done" there, and it is that law, ordinarily and presumably, that the parties intended should govern the contract in all its incidents, and by which its validity or invalidity is to be determined, unless the contrary manifestly appears from the attendant circumstances.

We had occasion in this court to consider the meaning of the phrase "doing business in a state" in the case of Hazeltine v. Insurance Co., 55 Fed. 743, where many cases dealing with the phrase are gathered and commented upon, both American and English. It was

there held that a Tennessee corporation insuring property in the state of Maine by a correspondence through the mails was not doing business in that state, within the purview of the statutes of Maine regulating the service of process upon foreign insurance companies, and the suggestion is there made that the remedy against the ambiguity of this phrase can be better met by legislation which shall within itself more explicitly define the conditions upon which the companies may act; and it will be found by an examination of the legislation cited in Thomp. Corp., supra, that many of the states, in drafting these restrictive acts, have with commendable distinctness declared the particular conduct on the part of the companies which .is prohibited, so that we can tell precisely what they mean by "doing business within the state." It seems to be the result of the English cases cited in that case that there must be a managing, controlling, or governmental element in the business done by the corporation in England,—a sort of branch of the foreign company established there, —and that the foreign corporation, in a sense, must be domiciled in England, very much as if it had been chartered there. And one cannot read the act of the Tennessee legislature of March 21, 1877 (chapter 31), and of March 17, 1891 (chapter 95), and of March 26, 1891 (chapter 122), without coming to the conclusion that this was the dominant idea in the mind of that legislature at the time of the passage of these acts, namely, that these foreign corporations should be domesticated in the state of Tennessee and become, pro hac, Tennessee corporations, suable in the courts of the state, responsible to the citizens of the state just as its domestic corporations were, and that it is that kind of "doing business" within the state which was contemplated by the statute,—very much as the phrase is defined by the English cases above referred to. In one of these English cases it was held that a foreign corporation could continuously run a railroad upon the soil of England, with all the appurtenances of agents and the like, and still not be "doing business," within the meaning of this phrase. The phrase was also somewhat considered in the case of Henning v. Insurance Co., 28 Fed. 440, where the property insured was situated in Minnesota, and the business was done by the mail, and through a broker residing in Illinois. From the cases referred to, it will be seen that the phrase "doing business" is to be interpreted with regard to something more than the mere linguistic signification of the words used to the ordinary ear, and that it has acquired in legal terminology a much narrower meaning than that which is given to it in the argument in favor of this plea. The result of this consideration is that the contract involved in this case is not affected by this legislation, and that it is not invalid or nonenforceable in the courts of Tennessee, as has been supposed in favor of the defense set up by the plea.

The second branch of the plea, however, also requires some consideration at our hands. The defense made is that the suit prematurely brought, even if the contract be valid, but this defense proceeds upon the theory that the contract originally was invalid, but has been given vitality by the curative act of May 10, 1895, c. 119. It is to be observed here that the prohibitive act of 1891 took effect on the 26th of March,

1891. This contract was made on the 1st of August, 1891, and that curative act (so called in the argument) took effect on the 10th of May, 1895. It appears by this plea that, more than three years before the curative act was passed, this company had complied with the act of 1891, and on the 30th of March, 1892, had filed a copy of its charter with the secretary of state, and on the 16th of May, 1892, had filed an abstract in the register's office of Haywood county, where this land lies. The argument in favor of the plea assumes that on the 1st of August, 1891, when this contract was made, it was invalid, because of the previous noncompliance with the regulations of the statute of the March preceding, and that the subsequent compliance with the statute in May, 1892, had no force and effect whatever to validate this contract,—accomplished nothing in its behalf,—and that it lay dormant until the passage of the act of 1895. Conceding that the transaction was within the prohibition of 1891, and this result does not follow necessarily. The groundwork of the argument is that the contract was absolutely null and void. It may be doubtful if the Tennessee cases have taken this position. They decide that prohibited contracts cannot be enforced in the courts of Tennessee, which is not the same thing, but far less than being null and void. But, in every case where this has been said, it has been said with reference to a still subsisting infirmity, and the cases, as far as I have seen them, have had no reference to a condition where that infirmity may be said to have been removed by any subsequent compliance of the parties with the regulations of the prohibitory act; and, so far as we are advised, it does not appear that the supreme court of Tennessee has considered that question in relation to this class of statutes. It will be observed in reading the text of Mr. Thompson on Corporations, at the sections already cited, that he notes that the decisions in the several states are of irreconcilable contradiction as to whether the contracts are void, only voidable, or only nonenforceable, as well as in other respects relating to their legal effect. It is stated that the supreme court of Indiana at first treated the contract as void at the election of the citizen of the state, and that he might even sue to recover the money back, but that the demoralization produced by this sanction of repudiation and spoliation induced that court, upon a reconsideration, to take the position —much commended by the author—that a failure to comply with the regulations of the statute does not make the contract absolutely void, but only operates to suspend the remedy until such time as the foreign insurance company shall comply with the statute; that until such compliance should take place any suit brought to enforce the contract would be only prematurely brought, and a plea setting up the defense should be, not a plea in bar because of the invalidity of the contract, but only a plea in abatement to dismiss that particular suit. As a result of this position, the compliance of the company with the regulations of the statute subsequently to the making of a contract would, ipso facto, vitalize that contract, and therefore it could be enforceable between the parties. 6 Thomp. Corp. §§ 7950, 7956; citing Insurance Co. v. Thomas, 46 Ind. 44, and Machine Co. v. Caldwell, 54 Ind. 270, 281. If this be the correct rule of judgment, when this company, in May, 1892, complied with the regulations of the statute, this contract

was at once, by that compliance, made good, and thereafter stood as if there had never been any infirmity in it.

It is to be observed that our act of 1891 does not impose any time, or limitation of time, within which the compliance of the foreign insurance company shall take place; there not being even an intimation in the act of such a limitation. Wherefore it would seem, from ordinary analogies, that by legislative permission the companies might at any time when they chose to do so comply with the terms of the act. It is then a wholly gratuitous assumption to maintain that the contracts made prior to that time, and in violation of the act, remain in the same state of infirmity in which they were when no such compliance had taken place. There is nothing in the nature and character of the prohibition—it not being immoral or vicious in itself—to support such a claim of invalidity. Whatever invalidity and infirmity there was arose solely and entirely out of the fact that the legislature had prohibited the making of the contract, and out of the sentiment that that which the legislature chooses to prohibit is just as much unlawful as if it were within itself vicious and immoral. Concede this; yet, if we find that the prohibition itself is only provisional, and not absolute; that the infirmity only arises under prescribed conditions, which may be removed, and that by the very terms of the act itself the conditions are such that they are within the control of the foreign corporation itself; that it may, by doing or not doing a particular thing, create the conditions or remove them,—it necessarily follows, it would seem, that the act of the party itself is all-sufficient to give that validity or invalidity to the contract which depends alone upon compliance or noncompliance with the conditions, according to its choice. Where the conduct is not within itself vicious and immoral, or condemned by a public policy existing entirely outside of any mere legislative expression of it, there would seem to be no very sound reason for holding to the sentimental idea that, once a contract is prohibited, it remains always prohibited, until the legislature may choose, by subsequent enactment, to remove the prohibition. The legislature might undoubtedly in the beginning have imposed such absolute prohibition, but it did not. It imposed only conditional prohibitions, and those conditions were left within the control of the parties to the contract, or one of them. Therefore it seems to us to be correct in principle to hold that subsequent compliance with the conditions of the statute would remove any objection that might ever have been made to the making of the contract, in such a case as that. It is no objection to this reasoning to say that this is giving retroactive effect to the act of compliance, because there is no reason why it should not be retroactive; and, in the very nature of the subject-matter of the legislation, such retroactive effect is possible, and will be presumed, in favor of the paramount public policy of freedom of contract, to have been within the contemplation of the legislature, and within its grant of a power to remove by compliance the obstructive conditions. Therefore we think that the compliance in May, 1892, was in itself an act which removed whatever infirmity there was in this contract, and that thereafter it might be enforced by the courts without regard to the act of 1895, subsequently passed. The infirmity theretofore existing was

that the courts of Tennessee, state and federal, would not enforce a contract made in disobedience of the statute; but whenever that disobedience was removed, and the parties complied with the conditions, there was no longer any substantial reason why the courts should not enforce it. Any reason that might be assigned for not enforcing it would be neither within the mischiefs to be remedied by the statute, nor within the enforcement of any public policy declared by it, but purely and entirely sentimental; the sentiment being that the contract, having been originally made in disrespect of the statute, should be forever disfavored by the courts, and repelled from their precincts, until the legislature had granted a statutory pardon. We think it will be found that courts do not proceed upon any such theory, unless the infirmity inheres in the vicious and immoral or criminal nature of the act itself. The act of 1891 carried its own curative remedies. In Haworth v. Montgomery, 91 Tenn. 16, 18 S. W. 399, the statute required that satisfactory proofs that the applicant possessed the necessary qualifications to practice medicine should be made within six months after the passage of the act, and this was a positive limitation of the time within which the thing required should be done,—a condition wholly wanting, as before remarked, in this act of 1891 in relation to foreign corporations; and this is a distinction that must not be overlooked in the cases treating of this subject.

It has been held, and it is an obviously correct principle, that it is within the power of the legislature, where such contracts as this are made void, to make them valid by retroactive operation of legislative authority, inasmuch as they do not impair the obligation of a contract, nor devest the parties of any of their rights of property, so that neither constitutional inhibitions against retroactive laws, nor the general public policy against them, shall prevent the operation of such beneficial retrospective laws; and it is also obvious that to bring them within this principle requires quite the same reasoning that we have already indulged in favor of this contract because of the subsequent compliance with the statute that took place in May, 1895. The implied vitality arising, under the original act of 1891, whenever a foreign corporation should comply with the statute subsequently to the making of a contract which was prohibited before it had complied therewith, rests upon precisely the same ground with the more direct and express grant of vitality contained in a retroactive law subsequently enacted for the purpose. 6 Thomp. Corp. § 7963, citing Mortgage Co. v. Gross, 93 Ill. 483, 494. Somewhat upon the same principle, that such statutory and constitutional prohibitions will not be extended beyond the reasonable intendment of the legislature in the enforcement of its policy, it was held in Fritts v. Palmer, 132 U. S. 282, 10 Sup. Ct. 93, that the title to real estate acquired in the teeth of a prohibition like this, notwithstanding the more absolute dominion of the state over the lands lying within its own territory, and notwithstanding that the corporation violated the statute, might be transmitted by the corporation, and be available in an action of ejectment. Other cases to a like effect will be found cited in 6 Thomp. Corp. § 7964; and from these cases it will be seen that all courts everywhere do everything they

can to preserve to the parties the benefits of their contracts, and their right to enforce them, in all cases where there is not inherent in the contract itself some hurtful vice or immorality or the like. Where the thing itself is harmless the legislature is not presumed to do anything more than to protect the public against the mischief which is indicated by the nature and character of the legislation itself, and that indicated by this legislation was that of having foreign corporations "doing business within the state of Tennessee" without sufficient information on the part of the people of the nature and character of their charters held under a foreign authority. It was only a policy of registration, for the purpose of convenient evidence and domestication, and perhaps for the purpose of subjecting the company conveniently to the processes of the state courts; and possibly there was some intention of ousting the jurisdiction of the federal courts, by making these foreign corporations domestic corporations, pro hac. But this last, as we now know, is impossible of accomplishment, since the subsequent decisions declaring the surer and more satisfactory foundations on which the federal jurisdiction has been placed by the constitution and legislation under it. Railway Co. v. James, 161 U. S. 545, 16 Sup. Ct. 621; U. S. v. Express Co., 164 U. S. 686, 17 Sup. Ct. 206; Railway Co. v. Steele, 167 U. S. 659, 17 Sup. Ct. 925. Therefore the public policy indicated by these statutes must be confined to that of securing a speedy response to the processes of the state courts, and the furnishing of convenient evidence of chartered rights and privileges, all of which is fully accomplished by actual compliance with the statute subsequent to the making of any given contract, and there is no longer any reason for holding it invalid or unenforceable.

It is suggested that the act of May 10, 1895 (chapter 119), called in the argument the "curative act" of 1895, is a legislative expression contrary to this view, inasmuch as by that act it is assumed that contracts made under the circumstances in which this was made, without first having complied with the provisions of the act, were invalid, and required the curative administration of legislative authority as contained in this latter act of 1895. If it should be conceded that this was the view of the legislature in passing this act, it is at least only a construction by implication; and yet it is entirely consistent with the act itself to hold it to be one of supplementary caution, favoring a policy of rendering efficacious contracts made without compliance with the statutes, were it not for the conditions attached, which are to be presently considered. But whatever may be said in favor of it as a legislative exposition of a former statute, or a legislative declaration of the force and effect of a compliance by a foreign corporation subsequent to the making of a contract, such exposition, while having great weight and persuasive force, is not binding on the courts, especially when it operates to defeat contracts entered into before the recent legislation. Sedg. St. & Const. Law, 252; Wade, Retro. Laws, §§ 30–32; Cooley, Const. Lim. 93.

It cannot be denied, however, that this act does assume that all contracts made by a foreign corporation prior to a compliance with the act of 1891 are nonenforceable or invalid, and it permits them

to be enforced or makes them valid only upon condition that the creditor shall give the debtor two additional years after the passage of the act for the payment of the debt secured by the mortgage. This is a condition precedent to the legislative authority to enforce the contract. Whether or not it be constitutional, as against the prohibitions of the federal constitution against impairing the obligation of a contract, might be an interesting subject of inquiry, if the rights of these parties depended upon it. The argument in favor of its constitutionality is that it does not impair the obligation of the contract, but that it extends legislative grace and authority to a contract already invalid, or so infirm that it cannot be enforced, upon a condition with which the creditor may or may not comply, as he chooses, but the new grant only operates upon the creditors consenting to the extension of time for the enforcement of the mortgage lien. We say that it is possible, where the legislature has any favor to grant, that it may attach this condition without its action being obnoxious to the constitution of the United States in respect to the obligation of a contract, or the provisions of the state constitution in the same behalf; but, having reached the conclusion that the contract we have under consideration did not need any curative process on the part of the legislature, we feel relieved from the necessity of considering these questions.

But there is another view of this act which it is well enough to notice. All the decisions of the supreme court of Tennessee relied upon as a construction of the act of 1891 have been made since the 1st of August, 1891, which was the date of the making of the contract which we have under consideration; and it is the settled law of the federal courts that, where a contract or obligation has been entered into before there has been any judicial construction of a state statute by the courts of the state, a subsequent judicial construction of the statute by the state courts is not binding on the federal courts. If the parties to the contract find a construction by the state courts already existing at the time they made the contract, they are presumed to have entered into it with due regard to that construction, but they are not presumed to know that the legislature or the courts would subsequently place upon equivocal legislation a different construction from that implied by the making of the contract; and in the federal courts, at least, such subsequent judicial construction is not binding on the parties as a rule of statutory decision or property right. Therefore it is that, even if the defendants here be correct in their argument that the supreme court of Tennessee has construed this legislation as invalidating this contract, it is not, under the decisions, binding on us. Louisville Trust Co. v. City of Cincinnati, 22 C. C. A. 334, 76 Fed. 296; Jones v. Hotel Co., 79 Fed. 477; Douglass v. Pike County, 101 U. S. 677; Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10; Pleasant Tp. v. Aetna Life Ins. Co., 138 U. S. 67, 11 Sup. Ct. 215; Butz v. City of Muscatine, 8 Wall. 575. This case falls within the exception last mentioned by Mr. Circuit Judge Lurton in Louisville Trust Co. v. City of Cincinnati, supra, "where contracts and obligations have been entered into before there has been any judicial construction of the statutes upon which the con-

tract or obligation depends by the highest court of the state whose statute is involved." 22 C. C. A. 334, 76 Fed. 296, 301. Whether this rule is likewise to be applied to subsequent legislative construction, we do not decide, but suggest that there seems to be no substantial reason for any difference in this regard. But the federal courts are always reluctant to rely upon this principle, and are anxious to conform to the decisions of the state court whose statute is involved, and they resort to this independence of judgment only when impelled thereto by the impossibility of agreement with the judicial decisions of the state courts. We do not feel this necessity upon us in this case, and therefore do not base our judgment so much upon this independent power of construing the statute as we do upon the earnest conviction that, notwithstanding the very broad language found in the opinions of the supreme court of Tennessee, it has not construed this legislation so as to invalidate this contract, under any view whatever that may be taken of the facts of this case.

On the whole, we are of the opinion that this plea is insufficient as presenting any defense, either in bar of the relief prayed for by the bill, or in abatement of it; and it will be so declared, with leave to the defendants to answer over according to the practice of the court.

## Application to Pay out Money.

### (August 17, 1897.)

This bill was filed to foreclose a mortgage made to the Jarvis-Conklin Mortgage Trust Company by William E. Capell and Lezinka Capell, his wife.

The bill was filed on the 22d of April, 1897, and before any steps were taken in defense, by plea or answer or otherwise, and without any order of court, on the 24th of April, 1897, the defendants voluntarily appeared in the clerk's office, and paid into court, in legal-tender money, the sum of $6,163.50, and the following entry appears on the docket of the court in relation thereto:

"Memphis, Tenn., April 24th, 1897.

"Lee Thornton, as attorney for defendants in this cause, paid into court as follows:

| | |
|---|---|
| Legal-tender treasury notes | $6,000 00 |
| Gold coin | 160 00 |
| Silver | 3 50 |
| | $6,163 50 |

"And same is deposited in registry of the court by me.
"[Signed] John B. Clough, Clerk."

At the same time the clerk executed the following receipt in duplicate, a copy of which was retained and filed by him:

"Memphis, Tenn., April 24, 1897.

"Received from Lee Thornton, solicitor for all the defendants, the sum of six thousand one hundred and sixty-three and fifty-one one-hundredths dollars; the same being paid by defendant Lezinka Capell, on behalf of all the defendants, as a tender of the amount admitted by defendants to be due, of principal, interest, and costs, in equity cause No. 514, J. W. Cæsar et al. against Lezinka Capell et al., in U. S. circuit court at Memphis, Tenn.

"[Signed] John B. Clough, Clerk U. S. Circuit Court at Memphis, Tenn."
"$6,163.50."

Subsequently to the payment of the money into court the defendants appeared, on the 5th day of June, 1897, and filed their plea setting up the invalidity of the contract because the foreign corporation had not complied with certain statutes of Tennessee requiring the registration of its charter and abstracts thereof before doing business in the state. That plea has just been disposed of by an order pronouncing its insufficiency as a defense, and the plaintiffs move to have the money paid over to themselves.

HAMMOND, J. (after stating the facts as above). Plaintiffs have asked for an order to have the money that has been paid into the registry of the court by the defendants paid immediately over to them. It will be seen by reference to the receipt given for the money, and the memorandum on the docket of the court in relation thereto, that two days after the bill was filed, and more than a month before the pleas were filed or any defense was made, the defendants deposited in the registry of the court, voluntarily, and without any previous order or directions, and wholly of their own accord, the sum of $6,163.50, "as a tender of the amount admitted by the defendants to be due of principal, interest, and costs," to use the language of the receipt, which was accepted from the clerk. It is contended by the defendants that this money must remain here until the final judgment of the court, and that there is no authority to pay it to the plaintiffs, except upon the condition that they shall accept the same as all that is due to them, and end the litigation, or, more broadly, that it shall remain here until all the questions that are made by this plea or any subsequent answer that may be filed shall have been finally determined by the court; that it was paid in only for the purpose of securing the ultimate judgment of the court, and to prevent a sale of the property under the mortgage, or the necessity of applying for any injunction to restrain the exercise of the powers of sale therein contained. It will be seen by an inspection of the receipt that was accepted from the clerk that no such conditions were attached to the tender, or, if they were, it does not appear by anything now before us.

We do not find, upon a somewhat extended examination of our equity practice, that the law of tender, as known to the common-law courts, is applicable to courts of equity. The common-law courts borrowed their law from the equity courts, to some degree, when they departed from the ancient common law of tender between the parties inter sese before the suit was brought, and the continuing offer expressed in the plea of the defendant that he was still ready and willing to pay, and established a practice that the defendant might, outside of, and wholly beyond, that kind of an offer to make a plea of former tender good, come into court, and by its permission, and under its direction, pay money into court, to be dealt with under its orders according to the conditions accompanying the payment into court, established either by the rule of the court based upon the intention of the parties, or otherwise. There is no more obscure, difficult, and perplexing subject than the practice of the law courts in respect of such tenders, and there has been no subject upon which the decisions of the courts of England have been so vacillating. Finally they have come to regulate the matter by orders or rules of

court, either parliamentary or judicial, so that now, as we understand the authorities, the practice in courts of law is very much like that insisted upon by the defendants in this case, namely, that the money will remain in court until the final determination of the case. This is not, perhaps, an absolute rule, but altogether it is the general practice. The difficulty under the old law was one rather of pleading than of right to the money. The ancient law of pleading was so logical and sensible, and at the same time sensitive, that antagonistic or even inconsistent averments in the pleadings were not allowed to pollute the record; but the modern improvements by statutes have treated this as supersensitiveness, and impractical adherence to mere æsthetic form, and these now permit alternative or even inconsistent pleas to appear in the same record. In deference to this sensitiveness to pleadings in the old common-law courts, this payment of money into court was to be managed outside of the technical record, and it was so managed and conducted wholly by rules and orders of court, under which the practice became, as before stated, very perplexing. Owen v. Morgan, 35 Ch. Div. 492. The best and most instructive historical exposition of the subject of tender of money into court we have found is in the judgment of Williams, J., in the case of Wheeler v. Telephone Co. (1884) 13 Q. B. Div. 597, 603, et seq.; and again in the judgment of Read, J., in Levan v. Sternfeld, 55 N. J. Law, 41, 25 Atl. 854; and yet again by Wilkes, J., in Jonathan Turner's Sons v. Lee Gin & Mach. Co. (1897; Tenn. Sup.) 41 S. W. 57.

The result of the authorities, in their relation to the practice of the courts of law, seems to be that modern statutes like that we have in Tennessee, considered by Mr. Justice Wilkes in the case just cited, and the modern orders governing perhaps all the courts of both law and equity in England, require the retention of the money in court until final judgment, unless the plaintiff takes it out by leave of the court, with the understanding that he accepts the tender upon the conditions that have been made by the defendant, and in full satisfaction or amends of his claim. In other words, by a legislative sanction, or by order of court under a legislative sanction, as in England, the courts have ultimately rid themselves of the perplexities formerly existing, by adopting the simple rule that the money will be paid out only upon such conditions as the party who pays it in has attached to its payment, and will be treated rather as a security for the final judgment, if the plaintiff shall obtain one, than as any offer of intermediate amends or satisfaction. This has been more definitely settled to be the rule by the orders in England than it has by the statutes of Tennessee, or other analogous American statutes; for I understand Mr. Justice Wilkes to hold in the case just cited from Tennessee that there may be yet two sorts of tender,—one made strictly under the statute as it was in that case, and governed by the statutory rule,—but still payments may be made "under special rules prescribing conditions and terms." And, of course, where the tender is not made under the statute, the conditions and terms may be anything that is established by the rules and orders of court. The result of our Tennessee statute, as it is there construed, is that the defendant tendering money under it,

and paying money into court, does so in full satisfaction and liquidation of the plaintiff's demand, and, if accepted by the plaintiff, it must be so received. And it was held that the tender in that case was made under the statute. The money having been taken out without any order of the court, the plaintiff was held bound by the statutory imposition of satisfaction. Yet I understand the court to there maintain that the money may be "withdrawn by consent or under order of court, the order or consent fixing the terms of withdrawal"; and from many expressions and the general trend of the opinion in that case, as I understand it, the money, even under the Tennessee statute, is still within the control of the court, and may be withdrawn by its order; that order prescribing the terms and conditions which shall bind the parties in reference to that withdrawal. Be that as it may, I do not understand that this court is at all bound by that statute, being a court of equity, whose practice is regulated solely by the acts of congress and the rules of equity prescribed by the supreme court of the United States, which conforms in all cases to the practice as it existed in England in 1842, at the time of the adoption of the rules, except so far as it has been changed by act of congress, or by these rules prescribed by the supreme court. A payment into court, on the law side of our docket, might be taken as a payment made under this Tennessee statute; but a payment made by the defendants voluntarily into court, on the equity side of the docket, must be taken to be governed by the equity practice as established by the rules of the supreme court of the United States; and the question we have to determine is, what practice governs us in a case like this? And I must say that it seems to be quite as obscure as the other, but less perplexing, by reason of the fact that there never was a time when a court of equity did not have complete control of the question of the payment of money into court, or the payment of money out of it,—quite as complete control as the courts of admiralty have; and the practice is very similar in each of the courts. Daniell, Ch. Prac. (5th Ed.) 1770, 1793; Id. 1794–1816; Id. (1st Ed.) 498.

Strictly speaking, it is our belief that you cannot say that the law of tender, as known to the common-law courts, had any application to a court of equity or its practice, although when it appeared that a defendant had offered to a complainant in equity, before the suit was commenced, to do what he ought to do, a court of equity, in adjudicating between the parties, and particularly in determining the question of costs, which do not go in equity, as at law, absolutely according to the judgment, would be governed in the exercise of its discretion by that fact in determining who should pay the costs. But, beyond this, there was and is a requirement of a court of equity that both the plaintiff and a defendant who shall ask relief shall offer to do what is equitable and right to be done in the matter of paying money admitted to be due; and therefore, if one files a bill setting up, for example, the defense of usury, or the like, or, for another example, the defense of the invalidity of the contract under some statute, a court of equity would require the defendant, if he had received money, to pay that which was absolutely due, without regard to the defense of usury, and, if he set up the defense of the invalidity of the contract, that he should re-

fund the money he had received in the attempt to deal under the invalidating statute, before a court of equity would grant any affirmative relief. Daniell, Ch. Prac., supra. Also, there was another principle, that if a defendant came in, and by his answer admitted that a certain sum of money was due to the plaintiff, the court would, upon the application of the plaintiff, require the defendant to pay that which was admitted to be due into court, upon the bare admissions of his answer, either by way of security for the final judgment, or by way of immediate payment to the plaintiff, under such terms and conditions as the court should prescribe. And the court would, according to the circumstances of the case, hold the money as security, or immediately pay it out, upon the application of the plaintiff, to him. The courts do not always exercise this power upon the admission of the defendant debtor, nor under all circumstances would they grant the application to have money paid in; but they would frequently do so, according to the rights of the parties and the justice of the case, and the relation of the parties to each other. It was a more common practice in former times than now, to compel a defendant to pay money upon his admissions of what he considered to be due. Now, if a defendant, along with his plea or answer, or before plea or answer, should come and voluntarily pay the money into court upon an admission that that much was due to the plaintiff, the money would stand in the court subject to its orders and decrees, just as it would be if the money had been paid upon similar admissions under the direction of the court, according to the practice just adverted to. And I think that, for the purposes of this case, it may be conceded—though it is difficult to say upon the authorities just how the rule would be—that always heretofore, and certainly now, according to the practice in England, the court would recognize and enforce such conditions as the defendant would attach upon his voluntary payment of money into court, and compel the plaintiff to comply with those conditions, or else hold the money, even as against the conditions, until the final judgment of the court, as a security for that judgment, whatever it might be. But I do not find any suggestion of authority whatever that when a defendant has voluntarily paid money upon his admissions that so much and no more is due, without any conditions attached, he would be allowed under any circumstances to withdraw it, or to deny the right of the plaintiff to receive it according to the practice of the court. Nor do I find any suggestion of authority that if the defendant, in making such voluntary payment, choose to impose or attach conditions, the court will, after the money has been paid, if it can see that the plaintiff is entitled to it; allow the defendant to withdraw it because the conditions have not been accepted, and force the plaintiff to the execution of his decree by other means; and it is my judgment that the inference to be drawn from all the authorities is that the court, having once got hold of the money, either by the voluntary payment of the defendant into court, or by an enforced payment such as has been suggested, will hold onto it, and deal with it as the right and justice of the case demands, and will exercise the widest and most complete discretion, unhesitatingly, for the purpose of doing justice between the parties, notwithstanding any conditions that have been attached, unless it may be that, in the nature and char-

acter of those conditions, rights of property and title would require that the money be returned to the defendant notwithstanding his liability to the plaintiff. If such a condition as that existed, the court would return it to the defendant, and leave the plaintiff to whatever remedy he had otherwise to enforce his just claims against the defendant. A court of equity has the amplest powers to deal with a fund according to the right, and has, I think, never been embarrassed by any such perplexities as those which have concerned the courts of law. Mr. Daniell says:

"When money has been paid, stock transferred, or specific articles deposited in court, on decree or order at the original hearing, or upon further consideration of the cause, the matter furnished provides for the payment, transfer, or delivery of the same to the parties then entitled thereto." 2 Daniell, Ch. Prac. 1794.

This original hearing referred to means the hearing at the time the money was ordered to be paid in, when the rights of the parties probably should be settled, and that might be by interlocutory or final decree, according to the circumstances; and it will be seen, abundantly, from reading the text as to the payment of money into court and the payment of money out of court, that the party entitled thereto, whether plaintiff or defendant, has always had the right to apply to the court—upon petition, usually, and according to the ordinary practice, but sometimes upon motion—for the immediate payment of the money to him who was entitled to it. 2 Daniell, Ch. Prac. 1396, under title "Costs"; Id. 1391,—where it is said that if a first mortgagee receives from a second mortgagee a tender of all that is due of principal, interest, and costs, the first mortgagee will not be entitled to the costs of a foreclosure suit after the tender; and it seems to be principally a question of costs, where the money has been voluntarily paid as the amount admitted to be due to the plaintiff. If a mortgagor tenders money, interest shall cease, and the mortgagor ought not to keep the pledge. Manning v. Burges, 1 Ch. Cas. 29; Gyles v. Hall, 2 P. Wms. 378; 2 Chit. Ed. Dig. tit. "Tender," p. 1255; Id. tit. "Practice; Payment into Court," p. 1109; Id. p. 1111; Broughton v. Pitchford, 6 Madd. 295 (the latter case is an example of where the money is paid in as a security, and not as a payment); 5 Unit. Eq. Dig. p. 5134; Strange v. Harris, 3 Brown, Ch. 365; Brown v. De Tastet, 4 Russ. 126; Woods v. Downes, 1 Ves. & B. 49. And it will appear from the cases, also, that even where admissions are not made in the answers upon which moneys can be ordered to be paid, and where it has not been voluntarily paid, if, during the progress of the taking of an account, or at any stage of the proceedings, it shall appear in any way that a sum of money is actually due, the court has power to order it to be paid in and out immediately to the party who is entitled to it; and, so far as I can see, originally there was scarcely any limitation upon the power of a court of equity in dealing with such matters, though it must be confessed that the tendency of modern practice and modern decisions is to treat the money paid in as a security for the final decree; and it is not now nearly so common to order the money to be paid either in or out until after final decree; but if it does come in, in any way,

the court is not apt to hold it until the ultimate decree if it can be seen that, with due regard to the rights of all the parties, it can be justly paid out at once to him who is entitled to it. In Richardson v. Bank, 4 Mylne & C. 165, Lord Cottenham reviews the law of requiring money to be paid in upon admissions in the defendant's answer, which case well illustrates the former practice before it was changed by the rules and orders of court above referred to. Knight v. Haythorne, 4 Jur. 361; Rogers v. Grazebrook, 12 Sim. 557. In Emden v. Carte, 45 Law T. (N. S.) 329, as digested by Chitty (5 Eq. Dig. p. 5136, par. 10), it is said:

"Where a defendant by his statement of a defense denies that he is under any liability to the plaintiff, and at the same time pays money into court, and pleads that, although he is under no liability, the sum paid in is enough to satisfy the plaintiff's claim, the plaintiff may obtain payment out, under rule 4 of order 30, Judicature Act, and may either, under rule 4, accept it in satisfaction of his claim, and tax his costs, and sign judgment for the costs, or may go on with his action for the purpose of recovering more; and where the plaintiff succeeds or fails in recovering more, or even fails altogether in establishing that the defendant is under any liability, he will be entitled to retain the money so taken out of court."

These rules of English chancery practice were understood, as it will appear from the authorities, to express, not new legislation, but the then existing law upon the subject, and it is my judgment that this statement is a succinct exposition of the chancery practice as it had been understood from the earliest times. Emden v. Carte, 17 Ch. Div. 169, 768; Id., 19 Ch. Div. 311; Berdan v. Greenwood, 3 Exch. Div. 251; Hawkesley v. Bradshaw, 5 Q. B. Div. 302; Wheeler v. Telephone Co., 13 Q. B. Div. 597; Goutard v. Carr, Id. 598, in the note; London Syndicate v. Lord, 8 Ch. Div. 84; Gretton v. Mees, 7 Ch. Div. 839; Spurr v. Hall, 2 Q. B. Div. 615; Clover v. Adams, 6 Q. B. Div. 622; Emden v. Carte, 17 Ch. Div. 168, 768; Id., 19 Ch. Div. 311; Nichols v. Evens, 22 Ch. Div. 611; Harper v. Davis, 19 Q. B. Div. 170; Maple v. Earl of Shrewsbury, Id. 463; Greenwood v. Sutcliffe [1892] 1 Ch. Div. 1; Westacott v. Bevan [1891] 1 Q. B. 774. See, also, Nelson v. Loder, 132 N. Y. 288, 30 N. E. 369; Taylor v. Railroad Co., 119 N. Y. 561, 23 N. E. 1106; Foster v. Mayer, 65 Hun, 610, 20 N. Y. Supp. 487; Wilson v. Doran, 40 Hun, 633; Coghlan v. Railroad Co., 32 Fed. 316; Califarno v. MacAndrews, 51 Fed. 300.

It is another result of these cases, and their authorities to which they lead, that, where money has been paid into court upon an admission that that amount is due, the defendant will not be allowed to retake it, scarcely under any circumstances, though it might be that under some peculiar conditions it could be repaid to him. It would not do to say that the court has not the power to refund it to the party who paid it in, even upon such an admission, if it should turn out that the voluntary payment had been made under some misapprehension that would excuse its force and effect as being a voluntary appropriation of an amount that was due; but, except under special or irregular emergencies, it would not be repaid. Here, in this case, therefore, inasmuch as the defendants admitted that the amount of money they paid in was due, and voluntarily deposited it in the registry of the court before they had filed any plea or made

any answer, it does not follow that they can subsequently, by plea or by answer, set up a defense which would defeat the plaintiffs' right to the money so voluntarily appropriated to the plaintiffs and paid in. They might defeat the plaintiffs' right to costs or to any further interest, or of any right to foreclose the lien or make a sale under his mortgage or to recover any more than they paid in; but, as to the amount thus paid in unconditionally and voluntarily, the plaintiffs' title to the money would be quite as effectual and absolute as if the party had voluntarily, out of court, tendered it, and it had been accepted by the plaintiffs as an execution of the contract. This is not to be misunderstood as saying that by such a payment the defendants disable themselves from making defenses, but only that the fact that they have voluntarily paid the money may materially affect the defenses that they do make, and sometimes may make them nugatory and ineffectual. If, therefore, it should have turned out that we were of the opinion here that this contract was invalid, and that the parties had no right to make it in the teeth of the statute, and that it was absolutely null and void, yet if the defendants pay the money, and it is accepted by the plaintiffs, either voluntarily or under an order of the court, the defendants would then, as they do now, stand in the attitude, after having paid the money upon an invalid contract, of asking to recover it back; and where they have received plaintiffs' money in consideration of their mortgage, and appropriated it to their own use, and the repayment was nothing more than what an honest man should do, a court of equity would never be disposed to allow them to recover it back because, forsooth, the contract had been prohibited by the statute. Indeed, as we have shown already, were they to file a bill to enjoin the foreclosure of the mortgage, or to resist the payment of usury, or to make any such defense as that, the court would require, even if the contract were invalid, that they should refund the money, before it would give any aid in resisting the execution of the trust. Under such circumstances as these the defendants here would not be entitled to demand that the money be repaid to them, no matter what the court might ultimately think of the effect of the Tennessee legislation upon this contract. Equitably considered, the case is bare of the remotest equity on the part of the defendants to keep the money, and therefore it would have no hesitancy in paying it out to the plaintiffs at the earliest possible opportunity.

Without pursuing the subject further, we are satisfied that the plaintiffs are entitled to an order for the payment of this money to them. Strict practice, however, would require that the application should be made by petition, and not by motion, though it is sometimes done in that way; but I do not think it is material that the proceeding should be by petition, except where the petitioner wishes to offer to take it upon certain suggested conditions. 5 Chit. Eq. Dig. 5153; Daniell, Ch. Prac. 1791; Garratt v. Niblock, 5 Beav. 143; Petty v. Petty, 12 Beav. 170; Shipbrooke v. Hinchingbrook, 13 Ves. 394; Anon., 4 Madd. 228; Heathcote v. Edwards, Jac. 504; Oliver v. Burt, 1 Beav. 583. But this motion will not be granted except upon the condition, to be fixed in the order, that this payment un-

der the order of court is not to preclude the defendants from making any further defenses that they can make, in as full a manner as they could have made them if this order had not been made and the money had remained in court. Nor shall the payment to the plaintiffs be regarded as any acknowledgment by them that no more is due than the amount so paid under the terms of this contract; and all questions of costs and interest and the actual amount due shall be reserved until the final determination of the case, and this payment shall be held to be only a satisfaction pro tanto of the amount ultimately found due the plaintiffs under the terms of the contract. Also, out of abundant caution, the decree will contain a reservation of the right of the court to compel the plaintiffs to repay the money if it should turn out upon final hearing that the defendants are entitled to have it refunded to them. Ordered accordingly.