## EASTERN BUILDING & LOAN ASS'N v. BEDFORD.

(Circuit Court, W. D. Tennessee, W. D.    May 31, 1898.)

### No. 487.

1. FOREIGN CORPORATIONS—STATE REGULATION—"DOING BUSINESS."
   Complainant, a New York corporation, loaned money to defendant in Tennessee, taking as security a mortgage upon land in the latter state, without having complied with the conditions prescribed by the Tennessee statutes for foreign corporations doing business within the state. The negotiations were all carried on by mail, through agents in Tennessee, the loan being approved at the company's home office in New York, and all notes being payable at that office. *Held*, that the contract was made in New York, and to be performed there, and that the company was not doing business in Tennessee within the meaning of the statutes.

2. CONTRACTS—NONENFORCEABLE IN STATE COURTS—POWER OF FEDERAL COURTS.
   A federal court will not refuse to enforce a valid contract, harmless in itself, which is nonenforceable in the state courts merely on account of noncompliance with state administrative regulations.

3. USURY—LEX LOCI CONTRACTUS GOVERNS.
   A contract which would be usurious in the state where it is sought to be enforced is not subject to the usury penalties of that state if it is not usurious under the law of the state where it was made.

4. CONTRACTS—ENFORCEABILITY—CURING DEFECTS.
   Where a contract is nonenforceable simply by reason of noncompliance with administrative regulations of the state, and not because of any vice inherent in the contract itself, the defect is cured, and the contract rendered enforceable, by subsequent compliance with such regulations.

In Equity.    Bill to foreclose a mortgage.

By an act of the legislature of the state of Tennessee of March 28, 1891 (chapter 2), entitled "An act to regulate the business of building and loan associations," it was required that no building and loan association organized under the laws of another state should do business in Tennessee unless said association should deposit, and continually thereafter keep deposited, in trust for all its members and creditors, mortgages amounting to not less than $25,000 or more than $50,000, at the discretion of the treasurer. They were also required, before commencing to do business, to file with the treasurer of the state a duly-authenticated copy of their charter or articles of incorporation, and a certificate of deposit of the valid securities required. By another section the officers, directors, or agents of foreign building and loan associations were forbidden to solicit subscriptions to their stock in that state, or to sell or knowingly cause to be issued to a resident of the state any stock of the association, unless a deposit had been made in accordance with the terms of the act, and it had otherwise complied with its provisions. Agents were required to be licensed by the treasurer, for which they were to pay a fee of $2, and he was also to receive a fee of $25 for filing the papers mentioned in the act. Any violation of the prohibition against the sale of stock without a compliance with the act was made a misdemeanor, and punished as such by fixed penalties. By another act of March 17, 1891 (chapter 95), chapter 31 of the acts of the legislature of Tennessee for the year 1877, being sections 1992 to 2003 of Milliken & Vertrees' Code, was amended so as

to apply that act to corporations, chartered under the laws of other states, known as "building and loan associations," and other specifically enumerated corporations. The act of 1877, carried into Milliken & Vertrees' Code was an act for the encouragement of mining and manufacturing corporations, which were required, if desiring to carry on their business in this state, to file in the office of the secretary of state a copy of their charters or articles of incorporation, and such corporations were to be deemed and taken to be corporations of this state, subject to its jurisdiction, to sue and be sued therein in the mode and manner directed by law in the case of corporations created and organized within the state. Then the act conferred the privilege of acquiring and holding real property, which was made liable for its debts. The act gave resident creditors priority. Taxation was regulated. Rights of way were given for the maintenance of roads, bridges, canals, tramways, telegraph lines, etc.; but they were required to begin business within a year, it being declared to be the object of that act to secure the opening and development of the mineral resources of the state, to facilitate the introduction of foreign capital, etc.; and such corporations were authorized to establish villages and settlements for the use and residence of its employés and others; and the sale of liquor was prohibited within a radius of five miles of such villages and settlements. Subsequently, by an act of March 26, 1891 (chapter 122), this act (chapter 31, 1877) was extended to all corporations chartered or organized under the laws of other states or countries for any purpose whatsoever, which may desire to do any kind of business within the state of Tennessee. This last act further required that a copy of the charter should be filed with the secretary of state, and an abstract thereof in every county in which a foreign corporation desired to do business. And then, by section 3, it was enacted that "it shall be unlawful for any foreign corporation to do or attempt to do any business or own or acquire any property in this state without first having complied with the provisions of this act, and a violation of this statute shall subject the offender to a fine of not less than one hundred dollars, nor more than five hundred dollars, at the discretion of the jury trying the case." And by section 4, when the corporation had complied with the provisions of the act, it should be to all intents and purposes a domestic corporation of the state, and if it had no agent in the state upon whom process could be served, it was liable to attachment, to be levied upon any property owned by the corporation. The last section of the act re-enacted the provisions of chapter 31 of the Acts of 1877, thus extending all the privileges of that original act to all corporations whatever coming into the state to do business. The plaintiff is a building and loan association of the state of New York, having its location at the city of Syracuse, which has never complied or attempted to comply, except as hereinafter stated, with any of the foregoing acts, nor with a subsequent act known in the legislation of the state as the "Curative Act" of May 10, 1895 (chapter 119), which authorized corporations that had been doing business in the state contrary to the provisions of the former act to file their charters as required, and be relieved of the penalties and forfeitures incurred, but with the important provision that no suit should be instituted upon any contract thus made valid until after two years from the passage of the act.

By the charter of the plaintiff company it was authorized to establish a local board anywhere, to be composed of its members in that locality, to assist in carrying on its business, it being a mutual company. It had a firm of agents in Memphis, Shelby county, Tenn., and also a local board, composed of members thereabouts. On the 23d day of January, 1891, before the passage of any of the foregoing acts except that of 1877, the defendant signed in Shelby county, Tenn., a written application for shares in the plaintiff association in the form prescribed for the purpose, and customary in doing its business. This application was forwarded by mail through the above agents to the plaintiff company at its home office in Syracuse, N. Y. The application was granted by the board of directors at the home office, and on February 2, 1891, a certificate for 46 shares of the stock, amounting to $4,600, was issued to the defendant, being sent to him by mail through the Memphis agents. According to the scheme of the company, this stock was

to mature by the payment of its dues and assessments on the 1st of August, 1897. These dues and assessments were payable at its home office in Syracuse, N. Y., but a by-law authorized them to be paid to the local board or agent where the stockholder resided, if the stockholder so desired. On March 20, 1891, the defendant made a written application for a loan, which, according to the custom of the company, was sworn to, and appraisers appointed by the local board indorsed on the application a sworn appraisement of the property which was offered as security. In this application for a loan of $4,600 for 6½ years it was stated that the loan was to bear interest at the rate of 5 per cent. per annum, and a premium of 5 per cent. per annum, payable annually on or before the last Saturday of each month, "all payments to be made as the lender may direct," and to secure the same the defendant agreed to give a mortgage upon the property offered as security. This application and appraisement, like the application for stock, was sent by the agents, through the mail, to the home office at Syracuse, N. Y.; and on the 18th of May, 1891, the board of directors at Syracuse, in the state of New York, recommended and approved the loan. Subsequently Bedford made a written application, again sent through the mails for what is called "an advance of loan," and referred to the resolution of the board of directors of May 18, 1891, allowing the advance at "a premium of ten per cent.," attached to which written application was the affidavit of one of the agents, which was again forwarded to the board of directors by mail. The defendant and his wife then executed a mortgage upon real estate situated in Shelby county, Tenn., dated May 1, 1891, duly and properly acknowledged June 18, 1891, filed for record June 20, 1891, and duly recorded in the register's office of Shelby county. This mortgage acknowledged the receipt of $4,600, and secured the sum of $5,683.08, "the same being the principal, interest, and premium of the loan, evidenced by 78 notes, dated Memphis, Tenn., May 1, 1891, payable to said association at its office in Syracuse, monthly." Having signed these notes at Memphis, and recorded this mortgage, they were again forwarded by these agents, through the mail, to the home office, in the city of Syracuse, N. Y., and thereupon the plaintiff company drew its draft on the Bank of Onondaga at Syracuse, N. Y., in favor of the defendant, for the sum of $4,140, which in due course of business was paid to him, or to his order, at Syracuse, N. Y. The shares of stock were withdrawn, duly receipted for, according to the customary method of doing business. The plaintiff company did file a copy of its charter with the secretary of state on August 11, 1893, and an abstract thereof in Shelby county on August 15, 1893, more than two years after the completion of this transaction, and before the passage of the curative act. The 78 notes executed were all dated May 1, 1891. Each was for $72.86, except the last three, which were each for the sum of $38.36. They were all payable to the order of the plaintiff company at its office in Syracuse, N. Y., the first on or before the last Saturday of May, 1891, and each successive one on the last Saturday of every month thereafter up to and including the last Saturday of November, 1897. These notes represented the amount of dues estimated to mature and become payable on the shares of stock which the defendant held until the same should mature and reach their par value from the payment of the dues, together with the earnings thereon, and the interest and premium advance during that period. The shares of stock were also pledged as collateral security in addition to the mortgage. The mortgage itself contained stipulations to pay the principal, interest, and premiums, and to conform to the constitution and by-laws of the order, pay the fines and penalties prescribed thereby according to the intent and meaning of the articles of association, keep the buildings on the premises insured against loss by fire, to pay all taxes, and to perform all other necessary things relative to said premises which were imposed by the contract and by-laws of the association. The defendant further agreed to pay the monthly installment dues of 75 cents on each share. There was also a provision that if he should fail to pay any of the notes, shares, or dues, the whole should become fully due and payable; that the shares of stock should be forfeited, and the mortgage and contract should be immediately enforced. The notes were all paid up to and including the last Saturday of June, 1893, since which time none of the notes, assessments, or dues have

been paid. This bill was filed to enforce the contract and foreclose the mortgage, on the 24th of June, 1895, a little more than 30 days after the passage of the curative act, and before the 2-years limitation thereof had expired.

Buchanon & Minor, for plaintiff.
Froysier & Heath, for defendant.

HAMMOND, J. (after stating the facts). The defense in this case is without a particle of merit, the defendant having received nearly $5,000 of the plaintiff's money upon a loan secured by a mortgage upon his property in the ordinary way of such transactions. There is no reason why he should not pay the money back, and no defense is offered except that the plaintiff, being a foreign corporation, had no right to make the loan until it had complied with certain administrative rules and regulations of the state of Tennessee concerning foreign corporations. Naturally, repudiation of a debt admitted to be just finds its protest at the bar from the plaintiff's counsel. That protest also must find response in judicial judgment, unless the courts are compelled to sustain the defense upon some inexorable principle of law having its only justification in the maxim, "Ita lex scripta est." For my part, I am not prepared to concede to state legislation that unrestrained absolutism of power over foreign corporations which is being built up by the usurpation and enlargement of the recognized right to regulate foreign corporations doing business in the state. Those corporations are not outlaws from all constitutional protection because of this power to regulate them, nor because of a power to prohibit them from doing business in the state. That power of regulation or prohibition does not necessarily mean a power to forbid their home contracts with citizens of a foreign state, and about property in that state. It is not more imperious than the equally vaunted police power of a state, which it was said by the supreme court "cannot be put forward as an excuse for oppressive and unjust legislation." Per Mr. Justice Brown in Holden v. Hardy (Feb. 28, 1898) 18 Sup. Ct. 383; Davidson v. New Orleans, 96 U. S. 97; Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064. And, as in the case of the police power, the exaggerated claim of absolute power over foreign corporations has received its check, first in the dissenting opinion in Hooper v. California, 155 U. S. 648, 657, 15 Sup. Ct. 207, and now in the judgment of the full court in Allgeyer v. Louisiana, 165 U. S. 578, 17 Sup. Ct. 427; and that, too, in relation to legislation similar to that set up by this defense. What may be called the constitutional freedom of trade or right of contract as against such legislation has been fully sustained by the latest of these decisions, both as against the police power, where the public health, morals, or safety is not involved, and this power to regulate or prohibit the business of foreign corporations. "The question in each case," says Mr. Justice Brown in Holden v. Hardy, supra, "is whether the legislature has adopted the statute in exercise of a reasonable discretion, or whether its action be a mere excuse for an unjust discrimination, or the oppression or spoliation of a particular class."

When asked what public policy was at the back of the legislation of 1891 forbidding foreign corporations to do business in the state

without having first registered their charters in every county in the state in which they proposed to do business and acquire property, counsel for the defendant replied that it was to prevent irresponsible corporations from getting a footing in the state, and to advise the people as to the charter rights and privileges of the companies. Plainly, this is only administrative in its character, and is in no sense at all a policy which affects the health, morals, or general safety of the public; and, as applied to a contract like that we have under consideration, there is no effect of the policy that in any sense disparages the contract. It is as harmless as it was before, and in the nature of the public policy there is nothing to invoke that kind of protection which usually falls within the police power; and it is somewhat misleading, therefore, to attack the contract as being against public policy. The statute makes no distinction between responsible companies. Either may establish themselves by registering their charters.

As to the matter of information, the defense has rather a flimsy foundation, for it is far more likely that any one dealing with the corporation would depend upon the abundantly printed and circulated forms of the charter, which in this day of cheap printing and rapid communication is all-sufficient for the purpose of information, without the trouble of going to the county seat to inspect the records. There does not seem to be much in this suggestion to invoke the principle of public safety, or even the public welfare, as a foundation for the policy stated. It is not to be presumed that the object of the legislature was to make repudiation easy by furnishing a defense like this to the vast number of people who have resorted to the loan and mortgage companies to borrow money which they could not get at home, and could get abroad at cheaper rates. Possibly, the oft-reiterated charge that the real purpose of the legislation was to make fees for the registration officers in the different counties may furnish a clue to the kind of public policy which is the foundation of the legislation; but, evidently, forfeitures of contracts are not to be enforced by the courts in aid of a public policy like that unless it must be done in loyal obedience to the command of the legislature. Certainly, however, it does not fall within the class of cases mentioned by Mr. Justice Brown in Holden v. Hardy, where the legislature may impose limitations upon the right of contract to prevent detriment to the well-being and safety of the people or their property. It cannot be denied, nevertheless, that the legislature of Tennessee had the right, and the courts must enforce it, to require foreign corporations to comply with these regulations, and might affix any pains and penalties for that purpose which the legislature might choose,— and that has been done by this act; so that, if we had the malefactors against its prohibitions, and this were a case to enforce those penalties, as in Hooper v. California, supra, we might be compelled to do it. But when it is claimed that this act makes the contract between the borrower and the lender void or nonenforceable in the courts, it is another matter, which requires the strictest scrutiny before such a penalty can be invoked against the natural justice and the greater public policy of encouraging the enforcement of fair con-

tracts and compelling borrowers to repay the money which they have borrowed. It seemed to be conceded in the argument by the plaintiff's counsel that the supreme court of Tennessee does not recognize any distinction between statutes which, in their terms, declare a contract shall be void as one of the penalties imposed, and those which do no more than prohibit the doing of a thing, and impose a penalty; that by our Tennessee law, if the thing is prohibited any contract concerning it is void without any explicit declaration of the statute to that effect, and without reference to the fact whether the statute imposes other penalties or not. Stevenson v. Ewing, 87 Tenn. 46, 9 S. W. 230; State v. Phœnix Ins. Co., 92 Tenn. 420, 21 S. W. 893; Haworth v. Montgomery, 91 Tenn. 16, 18 S. W. 399; Anderson v. Railroad Co., 91 Tenn. 46, 17 S. W. 803; Railroad Co. v. Evans, 14 C. C. A. 116, 66 Fed. 809. It is not necessary in this case to go into a critical examination of the Tennessee cases to determine whether or not they go to the extent of declaring the contract void, or only to that of declaring that the courts of Tennessee will not enforce them, which, be it remembered, are two distinct results, the difference being all-important. If the contracts be void, they should not be enforced anywhere; but, if there be only a prohibition on the courts of the state from enforcing them, they might be enforced elsewhere, and as well, probably, in the federal courts sitting in the state of Tennessee, which are not subject to the prohibitions of the Tennessee legislature relating to the state courts. We are relieved from any considerations like these from the fact that this contract, in our judgment, was one over which the state of Tennessee had no power whatever, except possibly to deny its enforcement by the courts of Tennessee, though even that may be very doubtful. This was a New York contract, made in New York, to be performed there, and not in any sense a Tennessee contract. The making of such a contract is not doing business in Tennessee, and does not fall within the prohibitions of the statute. Essentially, it is not different in respect of this from the contract in the case of Allgeyer v. Louisiana, 165 U. S. 578, 17 Sup. Ct. 427; nor Loan Co. v. Cannon, 96 Tenn. 599, 36 S. W. 386; nor Lauter v. Trust Co., 29 C. C. A. 473, 85 Fed. 894; nor Cæsar v. Capell, 83 Fed. 403; nor Trust Co. v. Willhoit, 84 Fed. 514.

It is contended that the case of Association v. Cannon (Knoxville, Sept., 1897; Tenn. Sup.) 41 S. W. 1054, has authoritatively settled that the contract is void, and that the federal courts are bound by that decision. It does not appear from the report of that case whether the notes were payable in New York or Tennessee, though an inference that they were payable in New York is insisted upon by counsel for the defendant. It is true that in that case it was decided that the building and loan association was doing business in Tennessee contrary to the prohibitions of the statute, citing Lumber Co. v. Thomas, 92 Tenn. 589, 22 S. W. 743; Manufacturing Co. v. Gorten, 93 Tenn. 597, 27 S. W. 971. But it is to be particularly noted that the court does not decide that the contract was void, no matter whether it was a New York or a Tennessee contract, but only that "the court of chancery appeals was correct in holding that the contract was

illegal, and could not be enforced by the court, and in refusing to foreclose the mortgage of the building and loan association." If that be true of the Tennessee state courts, it is not necessarily true of the federal courts, as before intimated. It is a familiar principle that the federal courts do not follow the penal statutes imposing penalties of prohibition that relate only to matters of procedure and practice or to matters of jurisdiction. The legislature of a state cannot shut up the federal courts, nor deny parties access thereto. They may prescribe rules of property, and declare contracts within their jurisdiction null and void, and thereupon the federal courts will enforce the rules of property and refuse to enforce the void contracts; but, if the legislature leaves the contract valid, enabling the parties to enforce it within jurisdictions that are not amenable to the legislature of the state of Tennessee, I see no reason why the federal courts may not enforce such contracts, although their enforcement is prohibited to the courts of the state. This is not, however, to be misunderstood, as applying to those cases where the legislation is the exercise of a police power based upon a public policy appertaining to the health, morals, or safety of the state, to use again the language of Mr. Justice Brown in the case above cited. That class of cases is very near akin to those constituting rules of property. At all events, the federal courts will not enforce contracts that are vicious because they are contrary to the declared will of the legislature exercising that care for the health, morals, or safety of the public to which we have adverted. But it does not follow from this that they will refuse to enforce valid contracts that are harmless in themselves, and nonenforceable in the state courts, only because they are not in conformity to certain prescribed preliminary rules and regulations of an administrative character, necessary to be complied with before suit can be brought upon them in the state courts. I do not stop to support this enunciation by the citation of authorities, for the reason that it is not depended upon in favor of this judgment.

Whatever respect we may and should have for the adjudications of the supreme court of Tennessee in construing state statutes, it is not imperative that we shall follow a decision which is contrary to our own federal decisions above cited, and one which has been made long after this contract was entered into, and after the rights of the parties therein had fully attached. In such cases it is open to us to follow our own decisions and exercise our own independent judgment as to the validity of these statutes. The rule upon this subject is nowhere so well expressed as in the case of Louisville Trust Co. v. City of Cincinnati, 22 C. C. A. 334, 76 Fed. 296, in which case Judge Lurton was careful to collate the cases on the subject, and to declare the correct rule for our guidance. Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10.

Another observation upon the case of Association v. Cannon, supra, is worthy to be noted here, and that is that, although the contract was declared illegal, and not enforceable in the state of Tennessee, the result was so shocking to the sense of justice of that court that it resorted to the well-known principle that one asking equitable relief must himself do equity, and compelled the debtor to repay the money

borrowed out of the funds realized by the sale of the property, notwithstanding the so-called illegality of the contract, thereby substantially enforcing it notwithstanding the prohibitions of the statute. But, conceding all that may. be claimed for that case, and admitting that it is a fair inference from the statement of facts that that contract, like this, was to be performed in the state of New York, and not in the state of Tennessee, the final and all-sufficient answer to it is that, if the supreme court of Tennessee has properly construed the statute, it has been, in our judgment, declared unconstitutional by the supreme court of the United States in the above-cited case of Allgeyer v. Louisiana, 165 U. S. 578, 17 Sup. Ct. 427, just as a similar statute of Louisiana similarly construed by the supreme court of that state was declared unconstitutional.

In Cæsar v. Capell, supra, this court had occasion to examine the authorities upon which the ruling is based that a promissory note payable in the state of New York is a New York contract, to which the giving of a mortgage in Tennessee is only as incident, and not a part, of the contract; and it is only necessary to refer to the reasoning and treatment of the cases found in that opinion.  I adhere to that opinion, and hold that the facts in this case, which are not unlike the facts in that case, do not change the rule there laid down. It is true that there is much more ground on the facts of this case for the contention that the business was done in Tennessee than there was in the Case of Allgeyer, above cited, but this is only a superficial view of the subject.  In the Allgeyer Case the property insured was in the state of Louisiana.  The owner making the contract of insurance was in Louisiana.  That which he did to put the contract into being was done in Louisiana, by writing and depositing a letter in the post office at New Orleans.'  The agency which he used in his business was the telegraph and its operators or the post office and its officials.  They were all in Louisiana, and necessary agencies in the completion of the contract; and yet it was held that this was not doing business in the state of Louisiana, because the contract was to be. performed in New York, the premiums were to be paid there, the losses, if any, were to be paid there, which made it a New York contract; and the supreme court say that, if the supreme court of Louisiana was correct in holding that the Louisiana statute forbade the doing of those things in Louisiana because the company had not complied with statutes of prohibition similar to this we have in this case, the statute was in violation of the fourteenth amendment to the federal constitution by depriving the parties of their liberty without due process of law,—that is to say, the freedom to make a contract of insurance to be performed in the state of New York.  We must not be misled by the suggestion of counsel for the plaintiffs that in the Allgeyer Case it was especially noted that the defendant had no agent in Louisiana, thereby inferring that, if the company had had an agent in Louisiana, the decision would have been otherwise.  That is a mistaken reading of the case.  The constitution of Louisiana contained a provision that no foreign corporation should do business in the state without having one or more known places of business and an authorized agent or agents in the state upon whom process might

be served, and the court adverted to the fact that there was no known place of business and no agent in the state as a circumstance to show that the company was not doing business in the state, and as an indication of what was meant by that phraseology in the legislation then under consideration. It is not at all to be inferred from this that, if the insurance company had made this contract through the agency of some solicitor, who performed the function of mailing the correspondence by which it was effectuated, instead of that correspondence being mailed by the insured himself, the decision would have been otherwise than it was; and that is all the difference there is in this case. There Allgeyer wrote and mailed his own letters, which were necessary to complete the contract. Here the defendant's application and subsequent acceptance were also transmitted through the mails, albeit by the instrumentality of his own agents or fellow members of the building and loan association acting in the city of Memphis. These were only his messengers or agents to put his letters in the mails. The essential facts are that he applied in the state of New York by mail for a loan, and the acceptance of his offer was had in the state of New York, and transmitted to him by mail through the same agents as before. The contract was that he would pay the money, principal and interest, in New York, which made it a New York contract; and the fact that the creditor gave him the privilege of paying it here in Memphis if he chose to do so does not at all affect that circumstance. The most that can be said upon the facts of this case is that the preliminary negotiations for the contract took place in Tennessee. It may be that the agents through whom they were carried on were, in the sense of the Tennessee statute, as to those negotiations, doing business in that state contrary to the statute; and it may be that the supreme court will refuse to hold that the fourteenth amendment protects the defendant in his right to borrow money in the state of New York, and to mortgage his Tennessee land as security for it, if he does the business through such agencies, and may confine that valuable constitutional protection to the bare use of the mails; but I do not see why any such distinction should be made. If it be a sound distinction, the utmost that can be claimed is that the preliminary negotiations themselves were illegal, and subjected the offending parties to the penalties of the statute, as in Hooper v. California, supra; but this does not change the ultimate fact that the defendant here and the plaintiff there entered into a contract in the city of Syracuse, N. Y., for the loan of the money and the mortgage of the property. It was there in Syracuse that their minds came together through whatever agencies may have been used for that purpose, and the contract of lending or borrowing and mortgaging was done in the city of Syracuse, N. Y., and not in the city of Memphis, and therefore the statute of Tennessee has no application to it. That part of the business was not done in Tennessee, and it is only that part with which we are dealing in this case.

I understand the case of Allgeyer v. Louisiana to settle that it is not within the competency of the legislature to prohibit a citizen of Tennessee from borrowing money in New York from a citizen of New

York and giving a mortgage upon his property in Tennessee to secure it, and the fact that the lender is a New York corporation does not at all alter the right both of the defendant to make the contract of borrowing and of the corporation in New York to make the contract of lending according to its capacities in that state. The law of New York is the lex loci contractus in such cases, and not that of the state where the borrower resides. That is both the business and the legal status of the transaction. It is only a question of how the parties shall get together to make their contract. It seems to me quite preposterous to say, as was suggested in the argument, that the borrower must physically leave the state of Tennessee, and be physically present in the state of New York, in order to make such a contract valid. It seems to be agreed by the defendant's counsel that, if such physical presence in New York had occurred, this contract could be enforced. It is decided in Allgeyer's Case that it can be enforced if the contract is made through the agency of the mails; that is to say, through the functions of the postmasters. I suppose it would be agreed that if the defendant had made the same contract through the agency of the express company that it would not have been illegal; or if he had put a messenger on the cars, and sent him with a power of attorney to the city of New York, it would not have been illegal. Now, why is it any more illegal to negotiate through persons in Tennessee who are willing to take the burden of attending to the details, and transmitting their correspondence through the mails? For my part, I do not see any distinction that can be fairly drawn, upon the circumstances, between the two cases. We have, then, the broad principle that a contract of borrowing and lending to be performed in the state of New York is the doing of that business within the state of New York, and not within the state of Tennessee, no matter how or what agencies are used for the purpose, and no matter what punishments may be inflicted upon those who dare to accept such agencies within the state of Tennessee. And, moreover, we have in the Allgeyer Case the broad principle that the right of the citizen of Tennessee to make such a contract of borrowing, and of the New York corporation such contract of lending, cannot be prohibited by the legislature of the state of Tennessee; and it is a misapplication of the power of the state of Tennessee over foreign corporations to assume that it can exercise any such prohibitions upon the freedom of contracts. The whole argument in behalf of this defense proceeds upon the false assumption, in my judgment, that it was a contract made within the state of Tennessee.

It may be that this will very much narrow and limit the operation of this act of Tennessee, but I cannot see that that is any objection to the ruling here made. It may be that, if the foreign corporations can thus "do business" in Tennessee, we emasculate the power of the state of Tennessee to prevent their "doing business" in that state; but all this is a mere play upon the words, as the only effect of the ruling is to confine the power of the state to that class of prohibitions which prevent the foreign companies from becoming pro hac Tennessee corporations. That is the privilege given them by the original statute and all the later statutes, that if they will comply with

their provisions they shall, in effect, become domestic corporations. Indeed, the conception of the original statute was one of encouragement and indulgence, and not prohibition. And the fallacy of the defense is that unless they accept the benefit, and thus become domestic corporations, they shall not be allowed to make contracts with the citizens of Tennessee at all. How far they may go in that direction we need not decide, but we have now the authority of the supreme court of the United States for saying that the legislature cannot go to the extent of prohibiting the making of a contract to be performed in the state of New York. There is no anomaly in this position, for, in the former opinion upon this question I cited the case of a Scottish railroad company which built its tracks within the territory of England, and ran its traffic trains every day over that territory, kept its station houses and station agents there, and yet that was held not to be "doing business" within the territory of England. Cæsar v. Capell, supra; Hazelton v. Insurance Co., 55 Fed. 743, 750.

Reference has been made in the argument to a Tennessee process act of March 29, 1887 (chapter 226), defining, for the purpose of serving process in suits brought against foreign corporations in Tennessee, what is to be, in the purview of that act, held to be "doing business" within the state. That is a special statutory definition for a special purpose, and cannot be perverted to the purposes of an interpretation of another act where only a similar phraseology is used for an entirely different purpose. The truth is, this phrase, "doing business" within the state, or "engaged in business" within the state, is of such an indefinite and uncertain meaning, so vague and ambiguous, so elastic in its quality, that an act of the legislature which uses it without defining it is almost nugatory for want of certainty as to its meaning; and, following the well-known and cardinal rules of construction, such phraseology will not be construed by the courts to prohibit harmless contracts, or to secure formidable forfeitures upon the mere literalism of the words used. If one should undertake to define the phrase by specific or particular designations of the things prohibited, he might be expected to encounter difficulties in doing what penal acts should do in respect of explicit definitions of the offenses created; and as well some lack of power to extend the prohibitions beyond the territorial limits of the state. It is not possible to build a Chinese wall around a state, so that a citizen of it shall make no contracts with a foreign corporation except by permission of the state. The Allgeyer Case settles that the mails, at least, will break through such a prohibitory contrivance.

The defense of usury is untenable. The contract is not usurious under the laws of the state of New York, and in that respect the case certainly is governed by the above-cited case of Loan Co. v. Cannon, 96 Tenn. 599, 36 S. W. 386, which holds that the usury laws of Tennessee can have no extraterritorial effect. It has always seemed to me that that case also is almost a direct judgment in favor of the ruling here that this was a New York contract. It decided under very similar circumstances that it was a Minnesota contract, and therefore not subject to the usury penalties of the Tennessee

statutes. If it was a Minnesota contract for the purposes of usury, it was a Minnesota contract for the purposes of the prohibitions of the act of 1891.

This view of the case makes it unnecessary to consider the contention of the plaintiff that the defendant is estopped to contest the validity of the contract, upon the ground that he is himself particeps criminis, and acting in violation of whatever state law there may have been; that he is taking advantage of his own wrong and his own turpitude as a violation of the statute, as a defense to a debt voluntarily contracted, and for which he has received full consideration. Also upon the ground that, having received and used plaintiff's money with full knowledge, necessarily implied, if not actually existing, of the plaintiff's alleged incapacity to contract in Tennessee, he is estopped to set up that incapacity as a defense upon much the same ground that one who deals with a corporation is estopped to deny the corporate character of the party with whom he deals. And, lastly, that the defendant was himself a member of this company at the time the act was passed, at the time he solicited the loan, and at the time he made the contract; that it was a mutual company, for which he is as much responsible as the other members, and therefore he will not be allowed to set up that its contract was illegal and void, but must leave it to the state to enforce whatever penalties and forfeitures may arise to him and his fellows because of his own illegal conduct in joining a mutual company acting in the state in violation of the law, or, what is the same thing, remaining in the company after the act was passed. It is possible that this is a good defense, but we need not decide the point. Gold-Mining Co. v. National Bank, 96 U. S. 640, was a case where a defendant sued by a national bank which had loaned him money was not allowed to plead as a bar that the bank had violated the act of congress in lending a larger amount of its capital stock than had been actually paid in. There the court says: "We do not think that public policy requires, or that the act of congress intended, that an excess of loans beyond the proportion specified should enable the borrower to avoid the payment of the money actually received by him." In Cowell v. Springs Co., 100 U. S. 55, upon a breach of a condition in a deed that intoxicating liquors should not be manufactured or sold upon the premises, the grantee was not allowed to set up the invalidity of the title in defense of a suit to enforce the terms of the condition. In Williams v. Gideon, 7 Heisk. 621, the principle is well settled that the creditor who has confirmed a fraudulent deed by receiving a benefit under it, or becoming a party to it, is estopped from impeaching it. And there are many other cases holding that corporations acting ultra vires and making invalid contracts may nevertheless enforce them against persons who have received the benefit, upon the doctrine that they are estopped to deny the binding effect of that which they have done voluntarily, and with full knowledge of the facts. Railway Co. v. McCarthy, 96 U. S. 258; Bank v. Matthews, 98 U. S. 621, where the court quotes with approval Mr. Sedgwick's statement that "where it is a simple question of authority to contract, arising either on a question of regularity of organization or of power con-

ferred by the charter, the party who has had the benefit of an agreement cannot be permitted in an action founded upon it to question its validity. It would be in the highest degree inequitable and unjust to permit a defendant to repudiate a contract the benefit of which he retains." Sedg. St. & Const. Law, 73; Arms Co. v. Barlow, 63 N. Y. 62; Sherwood v. Alvis, 83 Ala. 115, 3 South. 307; Ray v. Agency Co., 98 Ga. 132, 26 S. E. 56; Macon & A. R. Co. v. Georgia R. Co., 63 Ga. 103; Poock v. Association, 71 Ind. 357; Pancoast v. Insurance Co., 79 Ind. 172; Navigation Co. v. Weed, 17 Barb. 378. It must be conceded that this doctrine does not apply to contracts involving moral turpitude on the part of both contracting parties, or those which have some infirmity that arises out of a violation of public policy and public law, constituted and maintained for the safeguard of the public against dangers threatening the health, morals, and safety of the people; but this power of regulating foreign corporations and the methods of doing their business within the state, or prohibiting them from doing business within the state at all, has no such foundation as that. The laws are purely administrative, and more directory than mandatory in their character. At all events, if there are any cases involving the state's power over foreign corporations to which the doctrine of estoppel does apply, this case must fall within that class.

What has been said about the acts of 1891 applicable to all foreign corporations is equally applicable to the special act relating to building and loan associations of March 28, 1891 (chapter 2, p. 17, Acts 1891). That act is purely directory in its provisions. It does not impose any penalties for its violation, nor does it contain anything prohibiting the doing of business within the state without a compliance with its directions. Much less than the other acts can it be said to declare the contracts made by foreign building and loan associations without compliance with it void, or to forbid their enforcement in the state courts. Its seventh section prohibits the officers, directors, or agents from soliciting subscriptions of stock in this state, or selling or knowingly causing to be sold or issued to a resident of this state any stock of the association, without having deposited the securities required with the state treasurer; and it also requires the agents to have a license, for which, as always, a fee is charged, and it punishes violation of this provision by making it a misdemeanor. Some penalties are imposed upon domestic corporations for a violation of the directions requiring them to keep deposits with the treasurer, but there is not one line, word, or syllable of the whole act which makes the contracts void. However, since the act of March 17, 1891 (chapter 95), and the act of March 26, 1891 (chapter 122), in their terms apply to building and loan as well as to all other corporations, the whole legislation may be taken as standing together, pari passu, upon the same footing one with another, and, taken all together, it may be said that contracts falling within the prohibitions are not enforceable by the state courts of Tennessee, and perhaps not by the federal courts sitting within the state, though, as before remarked, that may be doubtful. Yet the fact remains that a contract by any of these corporations, to be performed in another state,

does not fall within the denunciations and prohibitions of the statute. These acts comprehend every foreign corporation whatever, and, if they are to be construed and enforced in the manner suggested by this defense, they would make void and nonenforceable every ordinary loan of money by a banking corporation in another state to a citizen of Tennessee carried on by correspondence through the mails or through the agency of local banks and loan brokers, as well as every other commercial contract which can possibly be conceived, made with foreign corporations. It is inconceivable that the legislature had any intention to give the statute such effect as that, and the true spirit and meaning of the act is, in my judgment, found in the fourth section of the act of March 26, 1891 (chapter 122), and also of the original act of 1877 (Mill. & V. Code, § 1994), as follows:

"Sec. 4. That when any corporation complies with the provisions of this act it shall then be to all intents and purposes a domestic corporation, and may sue and be sued in the courts of this state, and subject to the jurisdiction of the courts of this state just as if it were created under the laws of this state."

This means that foreign corporations may have the privilege of becoming Tennessee corporations by compliance with these statutes, and their domestication was the real purpose of all the acts. Foreign corporations that desire such domestication must comply with the provisions of these statutes, and if they carry on their business in the same manner that domestic corporations do, and make their contracts to be performed within the state of Tennessee without compliance with these acts, then they are within the pains and penalties of the statutes. But if they confine their business to their own home places, make their contracts there, to be performed there, as was done in this case, they are not within the pains and penalties of the acts, and such contracts are not affected by them. As to such contracts, it is not within the power of the state to discharge or suspend their obligations. It may be within the power of the state by judicial construction of the act to close the courts of Tennessee to their enforcement, but they cannot close the courts of the United States to suitors who resort to those tribunals for enforcement of the contract. Says Mr. Justice Clifford, in Green v. Collins, 3 Cliff. 494, Fed. Cas. No. 5,755:

"Doubts may at one time have existed upon the subject, but it is now well settled that a state law cannot discharge or suspend the obligation of a contract made in another state if it was legal where it was made, and was a contract with a citizen of another state; not even if it was to be performed in the state whose law is invoked to defeat the remedy."

He cites Baldwin v. Bank, 1 Wall. 236; Suydam v. Broadnax, 14 Pet. 74; Union Bank v. Jolly, 18 How. 503; Watson v. Tarpley, Id. 520; Hyde v. Stone, 20 How. 175; Demeritt v. Bank, 1 Brunner, Col. Cas. 598, Fed. Cas. No. 3,780; Hunt v. Danforth, 2 Curt. 592, Fed. Cas. No. 6,887, in which Mr. Justice Curtis remarks, "No state law can, proprio vigore, deprive this court of jurisdiction conferred by the constitution and laws of the United States," applying the doctrine to the effect of the insolvency laws of a state. See, also, Cowles v. Mercer Co., 7 Wall. 118; Railway Co. v. Denton, 146 U. S. 202, 13 Sup. Ct. 44.

It is sufficient to refer to the case of Cæsar v. Capell, 83 Fed. 403, to the judgment of the court upon the effect of the filing of the charter with the secretary of state and the abstract thereof on August 11, 1893, subsequently to the making of the contract, and prior to the passage of the curative act of May 10, 1895. We there held that a compliance with the statute prior to the act of 1895 was, in itself, a sufficient filing, which removed whatever infirmity there was in the contract; and therefore it might be enforced by the courts without regard to the act of 1895 subsequently passed. It was there said:

"The infirmity which existed before that time was that the courts of Tennessee, state and federal, if you please, would not enforce a contract made in disobedience of the statute; but whenever that disobedience was removed, and the parties complied with the conditions, there was no longer any substantial reason why the courts should not enforce it. Any reason that might be assigned for not enforcing it would be neither within the mischiefs to be remedied by the statute nor within the enforcement of any policy declared by it, but purely and entirely sentimental; the sentiment being that the contract, having been originally made in disrespect of the statute, should be forever disfavored by the courts and repelled from their precincts, until the legislature had granted a statutory pardon. We think it will be found that courts do not proceed upon any such theory unless the infirmity inheres in the vicious, immoral, or criminal nature of the act itself."

This still seems to me quite a substantial answer to the defense that has been set up in this suit. The result is that the plaintiff is entitled to a decree for the collection of its debt and the foreclosure of its mortgage, and the usual decree for that purpose will be drawn and entered. Decree accordingly.

---

## THE META.

### (District Court, E. D. New York. June 21, 1898.)

NEGLIGENCE—PERSONAL INJURIES—PRESUMPTIONS.

In a libel in admiralty to recover for personal injuries, where the evidence is such as to leave the circumstances and cause of the injury so uncertain that the court can give no logical reason for determining the issue in libelant's favor, the presumption that the person charged with the tort is not guilty must be maintained.

This was a libel in rem by Thomas Hanson against the steam tug Meta to recover damages for personal injuries.

Foley & Wray, for libelant.
Carpenter & Park, for claimant.